## MID-CONTINENT PETROLEUM CORPORATION v. SAUDER et al.

### No. 773.

*Circuit Court of Appeals, Tenth Circuit.*
Sept. 14, 1933.

10

McDERMOTT, Circuit Judge, dissenting.

R. H. Wills, of Tulsa, Okl. (J. C. Denton, J. H. Crocker, I. L. Lockewitz, and J. P. Greve, all of Tulsa, Okl., on the brief), for appellant.

W. L. Huggins, of Emporia, Kan., and Ray S. Pierson, of Burlington, Kan., for appellees.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Philip Sauder brought this suit against the Mid-Continent Petroleum Corporation seeking the cancellation of an oil and gas lease covering the east half, and the southeast quarter of the southwest quarter, Sec. 16, Tp. 23 South, Range 13, Greenwood County, Kansas, as to the undeveloped portion thereof. We shall refer to the land just described as the Sauder lease. During the pendency of the cause, Philip Sauder died, and it was revived in the names of appellees herein, who are all his heirs at law.

The lease was entered into June 6, 1916, and ran from Philip Sauder and Annie Sauder, his wife, to W. A. Moon and J. W. Phillips. It passed through mesne assignments to the Petroleum Corporation. It contained the following provision:

"That the said parties of the first part * * * do hereby Lease and Let unto the said parties of the second part the exclusive right for Ten Years from date hereof, and as long thereafter as Oil or Gas can be procured thereon in paying quantities, to enter upon, operate for and procure Oil and Gas upon the following described premises. * * * "

During the primary term of the lease, the predecessors in title of the Petroleum Corporation completed two wells on the southeast quarter of the southwest quarter of section 16. The first well was completed November 1, 1921, and the second January 1, 1922. There has been no further drilling on the Sauder lease.

The only evidence introduced by the appellees was a map showing producing wells situated east of the Sauder lease in sections 10, 15, and 22, and south and west thereof in sections 17, 20, and 21. The producing wells nearest to the Sauder lease were: One situated 660 feet east of the east line, one 200 feet west of the west line, and two 200 feet south of the south line. The last mentioned wells were offset by the two wells drilled on the Sauder lease. The wells to the east of the Sauder lease were producing from the Bartlesville sand, and those to the south and west from the Mississippi lime.

The uncontroverted evidence on the part of the Petroleum Corporation established these facts:

The total revenue from the two wells drilled by the predecessors of the Petroleum Corporation, up to December 31, 1931, was $83,079, of which it received seven-eighths, and the Sauders one-eighth as royalty. Up to December 31, 1931, the Sauder lease had yielded to the Petroleum Corporation 5.1% per annum on the cost of the present development.

The Bartlesville sand in the vicinity of the Sauder lease is found in long narrow strips averaging about three well locations in width. The wells are located a distance of about 460 feet apart, and not nearer than 200 feet to the lease lines. The producing area of the strip of Bartlesville sand here involved has been well defined by drilling. Dry holes have been drilled between this producing area and the east line of the Sauder lease. Wells along the west edge of the producing area have produced more water and less oil than the wells farther east. The sand along such edge is thinner and is found at greater depths than at points farther east. Wells drilled north, south, and west of the Sauder lease encountered no production in the Bartlesville sand. These facts demonstrate that such producing area lies to the east of the Sauder lease.

The wells on the Sauder lease and those to the south and west thereof are producing from the Mississippi lime.

The Mississippi lime produces oil at its higher points and is barren of oil at its lower points, that is, the oil is found where the lime is nearer to the surface. The two wells drilled on the Sauder lease, and the wells drilled to the north, west, and south thereof indicate

that the lime, on this lease dips sharply in every direction toward the Sauder lease, except from the northwest to the southeast, and that the lime is so low on the Sauder lease that probably no oil will be found therein in paying quantities except in the southeast quarter of the southwest quarter. The geologist for the Petroleum Corporation estimated the lime on the undeveloped portion of the Sauder lease to lie at a depth of from 580 to 610 feet below sea level. The wells that encountered the lime at a greater depth than 570 feet below sea level in the vicinity of the Sauder lease, were usually dry holes or produced oil in negligible quantities.

Absence of oil in paying quantities in the Mississippi lime on the Sauder lease is indicated also by the following facts: Four dry holes were drilled near such lease, one in the southeast quarter of section 9, 1,880 feet north of the north line and 200 feet west of the east line of the lease, one in the northwest quarter of section 16, 630 feet west of the west line of the lease and 290 feet north of the center of section 16, and one in the southwest quarter of the southwest quarter of section 16, 200 feet west of the west line and 1,000 feet north of the south line of the lease. A well in the southwest quarter of section 15, 760 feet east of the east line of the lease, and a well in the northwest quarter of that section were drilled to, and failed to encounter oil in paying quantities in the Mississippi lime. The westerly well drilled on the Sauder lease encountered a thicker lime than the one to the east. The former produced 75 barrels of oil per day, while the production from the latter was slight. The former reached the lime at 558 feet, and the latter reached the lime at 574 feet below sea level.

Mr. Moody, vice president of the Petroleum Corporation in charge of production of oil and gas, testified that the geological information indicated that oil and gas would not be found in paying quantities on the undeveloped portion of the Sauder lease; that such was the opinion of the representatives of the Petroleum Corporation; that if future development or additional geological information should indicate that their opinion was wrong, they would be willing to drill additional wells on such lease; that they had not abandoned such lease, and it was their intention to hold it under the terms of the lease for future development.

The trial court canceled the lease, except as to a small tract in the southeast quarter of the southwest quarter of section 16, surrounding the two producing wells.

In Denker v. Mid-Continent Petroleum Corp. (C. C. A. 10) 56 F.(2d) 725, 727, 84 A. L. R. 756, this court said:

"In order to comply with the implied covenants of a lease to drill offset wells and to diligently develop the lease, a lessee must do that which, under the circumstances, an operator of ordinary prudence, having regard to the interests of both lessor and lessee, would do. Brewster v. Lanyon Zinc Co. (C. C. A. 8) 140 F. 801; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069, 1072; Goodwin v. Standard Oil Co. (C. C. A. 8) 290 F. 92; Humphreys Oil Co. v. Tatum (C. C. A. 5) 26 F.(2d) 882; Orr v. Comar Oil Co. (C. C. A. 10) 46 F.(2d) 59, 63; 40 C. J. p. 1067, § 684."

This is the rule announced by the great weight of authority. It has been approved by the Kansas decisions. See Webb v. Croft, 120 Kan. 654, 244 P. 1033, 1035; Howerton v. Kansas Nat. Gas Co., 81 Kan. 553, 106 P. 47, 34 L. R. A. (N. S.) 34; Id., 82 Kan. 367, 108 P. 813, 34 L. R. A. (N. S.) 46; Day v. Kansas City Pipe Line Co., 82 Kan. 861, 109 P. 186.

It has been recently followed in Broswood O. & G. Co. v. Mary O. & G. Co. (Okl. Sup.) 23 P.(2d) 387, where the court, under a state of facts similar to those in the instant case, refused to cancel the undeveloped portion of an oil and gas lease.

In Webb v. Croft, supra, decided April 10, 1926, the court said:

"The lease is silent as to the number of wells that shall be drilled on the land, and in such a case there is an implication that there shall be reasonable development of the land by drilling such number of wells as an ordinary prudent man would do under the circumstances, taking into consideration the results of the development and whether or not there was sufficient production to warrant the continuance of exploration and drilling."

However, in McCarney v. Freel, 121 Kan. 189, 246 P. 500, decided June 12, 1926, after the lease here involved was entered into, the court stated the facts as follows:

"The lease was dated June 15, 1912, and embraced a quarter section of land. The term was for 10 years, and as much longer as oil or gas could be produced in paying quantities. In October, 1912, a well was drilled which produced and still produces oil in paying quantities. In November, 1917, a dry

hole was drilled. No further effort has been made to develop the oil and gas resources of the land, although numbers of producing wells have been drilled and are in operation on all the surrounding land. *Plaintiff's evidence warranted the inference that defendants have not reasonably developed her land, and have no present intention to do so.*" (Italics ours.)

And then said:

"A lessee may not hold an entire quarter section of land with a single producing well after expiration of term, any more than he may do so before expiration of term. The implied covenant, fairly to exhaust capability of the land to produce mineral, subsists. If the undeveloped portion of the land will not produce mineral in paying quantities, and the lessee would not be justified in drilling more wells, he may not continue to hold by virtue of a provision in the lease extending the term so long as oil or gas may be produced in paying quantities."

■ There must be ground for the cancellation of an oil and gas lease. In the absence of fraud or mistake, there must be a substantial breach of an express or implied covenant of the lease. The burden of proof to establish such a breach was upon the appellees. Goodwin v. Standard Oil Co. (C. C. A. 8) 290 F. 92, 98. With respect to development, there is an implied obligation on the part of a lessee to drill such wells as under the circumstances an operator of ordinary prudence, having regard for the interests of both the lessor and lessee, would drill. The trial court did not find that the Petroleum Corporation had breached such implied obligation. Indeed, such a finding would have been wholly without support in the evidence.

The trial court's decision in the instant case was predicated on the doctrine announced in McCarney v. Freel, supra. The Supreme Court in that case said the evidence justified the inference that there was a breach of the covenant to develop. The decree was predicated on that breach. Here, as before stated, there was no breach of any covenant to develop, express or implied. We think it is distinguishable from the instant case.

If the doctrine announced in McCarney v. Freel, supra, is to be applied broadly to a state of facts such as exist in the instant case, it amounts to this: That where, under the existing circumstances and the known geological information, an operator of ordinary prudence having regard to the interests of both lessor and lessee would not drill on a portion of the lease, notwithstanding the provision of the lease that it shall extend to the whole tract as long as oil or gas is produced therefrom in paying quantities, the lessee by failing to drill on such portion forfeits his lease as to that portion. In other words, he must either do that which a prudent operator would not do or forfeit a portion of his lease. The implied covenant to develop imposes no such burden.

■ Since McCarney v. Freel, supra, was decided long after the date this lease was entered into, while persuasive, it is not binding on us. Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 S. Ct. 140, 54 L. Ed. 228; Denker v. Mid-Continent Petr. Corp. (C. C. A. 10) 56 F.(2d) 725, 727, 84 A. L. R. 756. It is true that in Day v. Kansas City Pipe Line Co., 87 Kan. 617, 125 P. 43, decided July 6, 1912, the Kansas court uttered a dictum which supports McCarney v. Freel, supra. But in the lease there involved, there was an express covenant to "continue drilling as long as paying wells were found or royalties were paid," and there was an express finding that the lessee had not diligently developed the leased premises. It is clearly distinguishable from the instant case, because here there was no breach of the implied covenant to develop, and there is no express covenant in the lease to continue drilling as long as paying wells are found or royalties are paid.

We are unable to subscribe to the doctrine of McCarney v. Freel, supra, as construed by the trial court, because in our opinion it either imposes a greater obligation under the implied covenant to develop than is recognized by the great weight of authority, including many Kansas decisions, or it places an obligation on the lessee not imposed by the lease contract, and in effect makes a new contract for the parties.

■■ With much geological information at hand strongly indicating an absence of oil and gas in paying quantities in the undeveloped portion of the Sauder lease, we think it cannot be said that the Petroleum Corporation has done other than what a prudent operator, under the existing circumstances, having regard for the interests of both lessor and lessee, would have done. In view of the long lapse of time since any development has taken place on the lease, the large area undeveloped, and the fact that the lessor is precluded from exploring it himself or through a third person, slight indication that the undeveloped portion contains oil or gas in paying quantities, regard for the interests of the lessee as well as the lessor, would require further development. But, under the

facts as they existed when this suit was tried, we are of the opinion that the Petroleum Corporation had violated none of the express or implied covenants of the lease contract. Until it has, or the lease has expired by its terms, it is entitled to continue to hold the whole of the Sauder lease.

The costs will be assessed against appellees and the decree reversed without prejudice to the bringing of a new suit, in the event changed conditions should indicate a breach of the implied covenant to develop.

McDERMOTT, Circuit Judge (dissenting).

There are two reasons which lead me to the conclusion that the decree of the trial court should be modified to require the defendant either to drill a well within a reasonable time or surrender the unexplored 320-acre tract.

## I.

An oil and gas lease in Kansas conveys an interest in real estate. Robinson v. Smalley, 102 Kan. 842, 171 P. 1155. The rights of a holder of an oil and gas lease are governed by the decisions of the state court. "These decisions constitute rules of property and must be accepted and applied in passing upon the complainants' rights." Guffey v. Smith, 237 U. S. 101, 113, 35 S. Ct. 526, 529, 59 L. Ed. 856. Unless there is a commanding reason to the contrary, a nonresident should not be permitted to acquire a greater interest in Kansas real estate than a resident may acquire; nor should a sovereign state be denied the power to determine, within constitutional limits, rights to real estate within its borders. Cities Service Oil Co. v. Roberts (C. C. A. 10) 62 F. (2d) 579.

To this settled rule there is a well recognized and proper exception. If an interest in real estate is acquired in reliance upon a rule of property then settled by state decisions, the federal courts will apply the law as laid down when the interest was acquired.

My understanding is that the genius of this exception lies in the reliance of the purchaser upon a rule of property law settled by the state decisions, and the injustice of denying to him the rights he believed he was acquiring. I do not understand that when a nonresident buys Kansas real estate he is not bound by any later decision of the Supreme Court of that state. A nonresident who sees fit to buy real property in another state ought to take his chances, along with residents, on how the Supreme Court of the state may eventually decide open questions.

Counsel for appellant state that McCarney v. Freel, 121 Kan. 189, 246 P. 500, "supports the conclusion of the trial court." It does. A lease on 160 acres was made in 1912. The original term had expired. The testimony for the defendant was that a lessee would not be justified in drilling more wells. In that case there was one producing well on 160 acres; in our case, two producers on 360 acres. That lease was less than 13 years old; the lease here was executed 17 years ago. The trial court there, as here, canceled the lease except as to a tract around the producing well. The Supreme Court of Kansas affirmed that decree.

It thus clearly appears that if the lessee of the Sauder lease were a resident of Kansas, the lessor would be entitled to relief. This nonresident lessee is not entitled to a greater right than a resident unless McCarney v. Freel is contrary to a rule of property established by the decisions when the lease was made in 1916. An examination of the decisions prior to 1916 persuades me that McCarney v. Freel did not overturn any settled rule of property law; but on the contrary finds support in the earlier decisions.

In Mills v. Hartz, 77 Kan. 218, 220, 94 P. 142, 143 (1908), the court laid down the general principles underlying mineral lease law as follows:

"The only consideration moving to the lessor for the right which he gave to the lessee to explore and procure minerals was the royalty on the coal to be found and the fixed compensation for each well when gas should be found and utilized, together with sufficient gas to supply two stoves in his farmhouse. If there were no search, nor any product, no possible benefit could come to the lessor for the exclusive rights which had been given to the lessee. It is not easy to infer that the lessor intended to give a valuable right for a nominal consideration, and permit the lessee to retain the right for a period of 20 years without development, when development was the chief purpose in the execution of the lease. Neither the character of the right given nor the nature of the instrument admits of such an irrational interpretation. The lease contemplates that the lessee shall proceed to dig and bore for gas, oil and coal, and that the lessor shall obtain gas for his farmhouse, not 20 years hence, but as soon as it can reasonably be procured."

In the case of Howerton v. Kansas Nat. Gas Company, 81 Kan. 553, 106 P. 47, 34 L. R. A. (N. S.) 34 (1910), the court cited

and followed Brewster v. Lanyon Zinc Co. (C. C. A. 8) 140 F. 801, 809, 810, which is undoubtedly the leading case on the subject of implied covenants diligently to explore and develop. The primary term of the lease involved in the Brewster Case had expired; there was one producing well thereon when the suit to cancel the lease was brought. Justice Van Devanter's entire opinion is illuminating, but the following excerpts are particularly pertinent:

"The implication necessarily arising from these provisions—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor. * * * The subject was, therefore, rationally left to the implication, necessarily arising in the absence of express stipulation, that the further prosecution of the work should be along such lines as would be reasonably calculated to effectuate the controlling intention of the parties as manifested in the lease, which was to make the extraction of oil and gas from the premises of mutual advantage and profit. * * * Upon both principle and authority it must be held that the present lease contains a covenant by the lessee to continue, with reasonable diligence, the work of exploration, development, and production at the end of the five years, if during that time oil and gas, one or both, are found in paying quantities."

It will be noted that the implied obligation includes that of "exploration." The Supreme Court of Kansas, in the Howerton Case, further indicated its conception of the duty of the lessee by the following quotation from the opinion of Justice Lurton in Petroleum Company v. Coal, Coke & Manufacturing Company, 89 Tenn. 381, 18 S. W. 65, 66:

"The 'testing' provided for was manifestly a condition upon which the lease depended. If such test showed no minerals, then the contract was at an end; if it, on the other hand, showed the presence of valuable mines, then the lessees were bound to operate them in good faith for the joint profit of themselves and the owners of the fee."

Culbertson v. Cement Co., 87 Kan. 535, 125 P. 81, 83, Ann. Cas. 1914A, 610 (1912), presents a different state of facts and the decision is not pertinent. The following statement of principle has some bearing:

"Since the number of wells to be drilled on the land was not specified, there was an implied obligation on appellants to fully develop the land and put down as many wells as were necessary to secure to appellee his proportionate share of the pool of gas. Kleppner v. Lemon, 176 Pa. 502, 35 A. 109; Thornton on Oil and Gas, § 91."

In Day v. Kansas City Pipe Line Co., 87 Kan. 617, 623, 125 P. 43, 45 (1912), there were eight producing wells on two eighty-acre tracts included in a single lease covering 600 acres. Although the primary term had not expired, an action was brought to cancel the lease. Relief was granted as to the 440 acres upon which no wells had been drilled. There was an express covenant in that case, not present here, "to continue drilling as long as paying wells are found or royalties paid." The case is therefore distinguishable from the case at bar. The court interpreted the lease to require "that drilling should continue with reasonable diligence so long as paying wells could be found," and then held:

"The appellant was, of course, not required to develop land that had been tested and found to be unprofitable for operation; but, if paying wells could not be found on the land or any part of it, there is no reason why appellees' title should be longer clouded with a barren encumbrance, nor any reason why appellant should resist a cancellation."

These decisions were all before the lease in question was executed. I think they do not conflict with those which follow; nor has the Kansas Supreme Court intimated, in any of the later cases, that there is any conflict between the earlier and later decisions.

Two years after this lease was given, the case of Alford v. Dennis, 102 Kan. 403, 405, 170 P. 1005, 1006 (1918), was decided. In 1902 the lessor executed one lease covering two tracts, one of 220 acres and one of 716 acres. There were many producing wells on the larger tract, but no exploration of the smaller. The primary term had expired. The Supreme Court of Kansas held that it "is not the province of the courts to end a contract merely because it is a bad bargain"; and that "The plaintiff asks the court to cancel this contract, to decree a forfeiture of it, and not for default of any expressed provision of the contract, but merely for default of one of its implied covenants. The instanc-

es are rare where equity will enforce a forfeiture. It will never do so where less drastic redress will satisfy the demands of justice." Citing then its earlier decisions, the court said:

"Unless the plaintiff's tract was to be developed some time there was no reason to include it in the lease, and as it stands it is of no value to defendants. Unless the defendants had a bona fide intention to prospect and develop this tract they had no proper purpose in leasing it, and to cancel the lease will do them no injury. While equity abhors forfeitures it likewise abhors injustice."

A decree was directed that the lease as to the 220-acre tract be canceled unless the lessee prospected and developed the tract within a reasonable time.

In Webb v. Croft, 120 Kan. 654, 657, 658, 244 P. 1033, 1035 (1926), the primary term had expired. The lease covered 580 acres and there was one producing well thereon. The closest development to the lease were two wells, each three-fourths of a mile away. The facts were not as favorable to the lessor as the facts here. The trial court entered a decree requiring the lessee to develop or cancel. The Supreme Court affirmed and held, upon authority of its earlier decisions, that:

"Leases of this kind contemplate exploration and development, and not the bottling up of land for speculative or other purposes or the postponement of reasonable development, nor yet the limiting of development to an extent merely to prevent a declaration of forfeiture. Although not expressly mentioned in the lease, there is an implied covenant or condition that there shall be reasonable development and such operation as will protect the interests of both the lessor and lessee. Howerton v. Gas Co., 81 Kan. 553, 106 P. 47, 34 L. R. A. (N. S.) 34; Id., 82 Kan. 367, 108 P. 813, 34 L. R. A. (N. S.) 46; Alford v. Dennis, 102 Kan. 403, 170 P. 1005; Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N. E. 502. The lease is silent as to the number of wells that shall be drilled on the land, and in such a case there is an implication that there shall be reasonable development of the land by drilling such number of wells as an ordinary prudent man would do under the circumstances, taking into consideration the results of the development and whether or not there was sufficient production to warrant the continuance of exploration and drilling. * * * We think the court rightly concluded that the land of defendants has not been sufficiently developed. It would be grossly inequitable to hold a tract of 580 acres with no more development than has already been made. Plaintiff was entitled to some remedy for the failure to develop it, and we think it was competent for the court, instead of decreeing a cancellation of the lease, to give the defendants an opportunity to make reasonable development of the land pursuant to their implied covenants as has already been determined in Alford v. Dennis, supra."

Then came McCarney v. Freel, squarely in point, and conceded by counsel to support the decree of the trial court.

There are other decisions of the Kansas Court, but these appear to be sufficient to demonstrate that there has been no change in the current of Kansas authority from the start; and that either before or after 1916, that court would not permit a lessee to hold 320 acres for 17 years without exploration or development. As I read the decisions of the Kansas court, they adhere to the same general test first announced in Brewster v. Lanyon Zinc Co., supra, and followed by our court in Denker v. Mid-Continent Petroleum Corporation, 56 F. (2d) 725, 84 A. L. R. 756. The difference is that the Kansas court places more emphasis on the phrase "having due regard for the interests of the lessor" than does our court. The interpretation given to a general rule becomes a part of the rule, just as an interpretation of a statute becomes a part of the statute.

If I am right in this analysis of the Kansas decisions, Guffey v. Smith, supra, requires that Kansas law be applied. If I am wrong in my construction of the earlier Kansas decisions, the question was at least an open one except for the dictum in the Day Case. Where the question is an open one at the time interests in real estate are acquired, the rights of the parties should be governed by the later decisions of the state court, and not by the still later decisions of the federal court. Why should the rights of these parties be determined by our decision in the Denker Case decided in 1932, instead of the decision of the state Supreme Court in the McCarney Case decided in 1926?

Forewarned by the earlier decisions and the dictum in the Day Case that the Kansas Supreme Court would adhere to the rule that the principal consideration moving to a lessor was the development of his property, and that emphasis would be placed on the lessee's obligation to pay heed to the interest of the lessor, this nonresident came voluntarily to Kansas and acquired this lease. It does no more than to hold it to its bargain to say to it "When you buy Kansas real property, you·

hold it subject to Kansas law." Unless the McCarney Case upset a rule of property law which was settled in 1916—and I can find no basis for such a claim—there is no reason for according this nonresident company rights in Kansas property which a resident company would not have acquired under the identical lease.

## II.

Even if the Kansas decisions are to be ignored, I come to the same conclusion. Since the decision in Brewster v. Lanyon Zinc Company, supra, the test laid down by both the state and federal courts is what a prudent operator, having regard for the interests of the lessor as well as his own, would do. If the phrase "having regard for the interests of the lessor" has any real meaning, I think the defendant ought not to hold 320 acres, almost surrounded by oil wells, without even one test well. The defendant, in common fairness, ought to give these lessors a well or get off and let some one else drill it.

Defendant's testimony is that the geologic inference is unfavorable. But geologic inference is not infallible. This is a spotted field, and its many dry holes give mute and expensive evidence of the fallibility of geology. Even Mr. Moody does not accord verity to his own geologists, for notwithstanding their unfavorable report, he is not willing to relinquish this half section. He frankly says that he wants to hold it because there may be oil under it. Of course that is true, or he would not go to the expense of defending this suit unless he thought enough of the possibilities to warrant the expense.

The truth is that this half section is neither proven nor condemned. No one will ever know whether there is oil under this land until a drill goes down. Mr. Moody says that; his geologists say it; their anxiety to keep it corroborates their statements. Mr. Moody wants some other company to drill on adjoining acreage; in other words, he wants to retain his gamble at the expense of his lessors and adjoining operators.

But geologic inference is not as unfavorable as defendant contends. I lay to one side the wells in the Bartlesville sand, for it appears to have pinched out before reaching this half section. But there are many wells in the Mississippi lime both to the northeast and to the southwest of this tract. The defendant's answer is that the Mississippi lime is too low under this lease to justify exploration. The lime under these 320 acres is from 570 to 610 feet below sea level, and much of the south half is between 570 and 590 feet. The map, prepared and introduced by the defendant, shows in the section adjoining on the southwest 23 producing wells where the lime is between 570 and 610 feet below sea level, and nine producing wells higher than 570 feet. It shows 18 producers within the 570–610 range in the field adjoining on the northeast, and three higher than 570 feet. There are dry holes between 590 and 610 feet, but there are dry holes as high as 564 feet. It is true that the wells are more productive on the higher spots in the lime, but there is no ground for condemning that part of this tract where the lime lies between 570 and 590 feet, for that is the bracket within which a large number of the adjoining producers were brought in.

Dry holes have been drilled in this field, two of them to the west of this lease. There are others to the southwest and the northeast, but there are also many producers there. The trend of the sand in the lime is undoubtedly under this lease, and part of it is at the depth where many wells have been brought in. Against these record facts, the defendant produces geologists whose opinions are adverse to drilling. But Mr. Moody, experienced with the fickleness of oil geology, knows too much to release this lease because of geologic guess. Their science is valuable to condemn the lease in court in justification of a failure diligently to develop; but he will not back their testimony by relinquishing the lease.

While the trial court made no specific finding upon the point, the decree entered must rest upon a finding that defendant has not complied with its implied obligation diligently to explore and develop the leased premises. I agree. The defendant company has tied up this half section for 17 years and has not drilled a single exploratory well thereon; it asks to hold it indefinitely in the future, with no hope of a well unless some other operator drills on adjoining land. Such conduct does not seem to me to square with the "due regard for the interests of the lessor" which was an integral part of its contract, under any rule of law or fair dealing.

I think the two small producing offset wells are enough to hold the forty on which they are situate. But I think a decree should enter that the lease as to the 320 acres be canceled unless, within a reasonable time, an exploratory well is drilled to the Mississippi lime.