# UNITED STATES *v.* GUARANTY TRUST COMPANY OF NEW YORK ET AL.

No. 402. Argued January 6, 7, 1930.—Decided February 24, 1930.

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Hughes* and *Messrs. Claude R. Branch, Charles H. Weston* and *Elmer B. Collins,* Special Assistants to the Attorney General, were on the brief, for the United States.

*Mr. Charles Bunn,* with whom *Messrs. Edwin S. S. Sunderland, Warren S. Carter, Henry V. Poor, Frederick G. Ingersoll, Joseph M. Hartfield, Jesse E. Waid, Norton M. Cross, Kenneth Taylor, James H. McIntosh, Edward H. Blanc* and *James C. Otis* were on the brief, for mortgage trustees, respondents.

*Mr. Henry .C. Carlson,* with whom *Messrs. Charles R. Fowler* and *Mortimer H. Boutelle* were on the brief, for the executors of the estate of H. H. Sheriff, priority creditor, respondents.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

On July 26, 1923, the federal court for Minnesota appointed a receiver of The Minneapolis & St. Louis Railroad upon a creditor's bill, which was later consolidated with suits to foreclose its mortgages. The usual order issued for proof of claims. The United States presented four claims arising under Title II of Transportation Act, 1920, February 28, c. 91, 41 Stat. 456, 457–469. As to each claim it asserted that, by § 3466 of the Revised Statutes, U. S. C., Tit. 31, § 191, it was entitled to preference and priority over the claims of all other creditors, secured or unsecured. Opposing creditors conceded that the Railroad was insolvent within the meaning of § 3466. *United States* v. *Butterworth-Judson Corporation,* 269 U. S. 504. The insistence that the United States did not have priority was rested, among other grounds, upon the origin and character of its claims. The master and the District Court denied the United States priority over any creditor. The Circuit Court of Appeals affirmed that decree, but limited its decision to a denial of priority over secured creditors and those whose claims were preferred by local law or by the rule of *Fosdick* v. *Schall,* 99 U. S. 235. It did not consider the relation of the Government's claims to those of general creditors, because it concluded that the estate would not realize more than enough to satisfy the secured and preferred creditors and because general creditors were not parties to the appeal. 33 F. (2d) 533. A writ of certiorari was granted.

Title II of Transportation Act, 1920, comprising §§ 200 through 211, is headed " Termination of Federal Control."

Section 207 (pp. 462–3), provides that the "indebtedness of each carrier to the United States, which may exist at the termination of Federal control, incurred for additions and betterments made during Federal control and properly chargeable to capital account . . . shall, at the request of the carrier, be funded for a period of ten years from the termination of Federal control, or a shorter period at the option of the carrier"; and also that any other then existing indebtedness to the United States should be evidenced by notes payable in one year from the termination of Federal control, or less at the option of the carrier. For both classes of debts, the carrier is to pay interest at the rate of 6 per cent. per annum and, in the discretion of the President, to give such security as he may require.[1] Two of the claims of the United States here in question are based on promissory notes made pursuant to this section. Each of the two notes is in the amount of $625,000. One is dated May 27, 1922, and is due March 1, 1930, ten years after termination of Federal control; the other is dated April 1, 1923, and is payable on demand. Each bears interest at 6 per cent., payable semi-annually, and is secured by a deposit of the Company's Series A 50-year refunding and extension mortgage bonds, dated January 1, 1912.

---

[1] See Report of Director General for the period December 31, 1921, 67th Cong., 2d Sess., H. R. Doc. 180, p. 12: "The total amount expended by the Railroad Administration for such additions and betterments aggregates $1,144,681,582.39. The Transportation Act of 1920 in Section 207, anticipated that the carriers might not be able to pay out of the compensation and other sums due them from the Government all the sums due the Government on account of capital expenditure, and therefore provided that only so much of the indebtedness due from the United States to the carriers should be offset by the indebtedness due the United States from the carriers 'as deemed wise by the President,' and further provided that any funding obtained by the carriers should be granted only upon their giving security in such form and upon such terms as the President may prescribe . . ."

The third claim arose under § 209. That section (at p. 466) authorizes the Secretary of the Treasury, upon certification by the Interstate Commerce Commission, to advance to any carrier, on account of the guaranty of operating income there provided for the six months following the termination of Federal control, sums "necessary to enable it to meet its fixed charges and operating expenses"—the advances to be "secured in such manner as the Secretary may determine"; and provides for repayment by the carrier of any amount proved to have been paid in excess of the guaranty. Compare *Great Northern Ry.* v. *United States,* 277 U. S. 172. The amount claimed by the United States under this section is $292,022.23, which sum the Interstate Commerce Commission certified had been advanced in excess of the guaranteed amount. See *Guaranty Settlement With Minneapolis & St. Louis R. R.,* 86 I. C. C. 691.

The fourth claim arose under § 210, (p. 468). "For the purpose of enabling carriers . . . properly to serve the public during the transition period immediately following the termination of Federal control," that section, as amended by Act of June 5, 1920, c. 235, § 5, 41 Stat. 874, 946, authorizes loans by the Government to carriers, if a loan is required by a carrier " to meet its maturing indebtedness, or to provide itself with equipment or other additions and betterments." The loans are to be made only on security; for a period not in excess of fifteen years; and if application therefor is made to the Interstate Commerce Commission within two years from the termination of Federal control. And no loan can be made, unless the Commission first finds and certifies that the loan is necessary to enable the applicant to meet the transportation needs of the public; " that the prospective earning power of the applicant and the character and value of the security offered are such as to furnish reasonable assurance of the applicant's ability to repay the loan within the time

fixed therefor, and to meet its other obligations in connection with such loan . . . and that the applicant . . . is unable to provide itself with the funds necessary for the aforesaid purposes from other sources." The claim under this section is on a promissory note for $1,-382,000 dated April 1, 1921, which was given in consideration of a loan of that amount, made to enable the Company to pay a maturing issue of its outstanding mortgage bonds. The note is payable in ten years, with interest semi-annually at the rate of 6 per cent., and is secured by a deposit of the Company's Series A, 50-year refunding and extension mortgage bonds, dated January 1, 1912. See *Loan to Minneapolis & St. Louis R. R.*, 67 I. C. C. 321, 323; *Bonds of Minneapolis & St. Louis R. R., ibid.*, 362.

The alleged priority of the United States under § 3466 over mortgages and over unsecured claims preferred by local law (compare *Spokane County* v. *United States*, 279 U. S. 80,) or by the rule of *Fosdick* v. *Schall, supra,* was discussed in the lower courts and was argued by counsel before this Court. But we have no occasion to consider these questions. For, we are of opinion that it was the purpose of Congress that § 3466 should not apply to any indebtedness of the railroads to the United States arising under §§ 207, 209 or 210 of Transportation Act, 1920.

During Federal control, the Government had been obliged to provide most of the new capital required for equipment, improvements and extensions,[2] and some of the funds needed to meet current interest and dividend payments.[3] The Federal Control Act, March 21, 1918, c. 25,

---

[2] See note 1, *supra*. Of the amount expended for these purposes during Federal control only $140,000,000, approximately, was paid through funds raised by the companies. Report of the Director General to the President for fourteen months ended March 1, 1920 (Revised Edition, 1921,) p. 31.

[3] Mainly for this purpose, the Director General advanced to the carriers between the commencement of Federal control and August 1,

§ 6, 40 Stat. 451, 455, appropriated $500,000,000 " to be used by the President as a revolving fund for the purpose," among other things, of providing " terminals, motive power, cars, and other necessary equipment." The Act of June 30, 1919, c. 5, 41 Stat. 34, appropriated $750,000,-000 more. The Transportation Act, 1920, §§ 202 and 210, made a similar provision in appropriating for the purposes of Title II, $500,000,000; in addition to the sums otherwise available and in addition to the general appropriations made in §§ 204 (g) and 209 (g), (h) and (i).

These appropriations were made in order to meet a pressing need. At the time of the passage of Transportation Act, 1920, most of the railroads of the United States lacked funds for necessary improvements, equipment, and expansion of facilities. Some of the carriers needed funds, also, to meet maturing obligations. The credit of many carriers was seriously impaired. There was a general reluctance among investors to purchase new railroad securities even of the strongest railroads. Congress deemed it important to preserve for the nation substantially the whole existing transportation system. Compare *New England Divisions Case*, 261 U. S. 184, 190. In order to accomplish this, it was thought necessary that the United

---

1918, $203,714,050. Report of the Director General for period ending July 31, 1918, pp. 23–24. In the statement of the President accompanying his Proclamation of December 26, 1917, on taking possession of the railroads, he had stated: ". . . the financial interests of the Government and the financial interests of the railways must be brought under a common direction. . . . Investors in railway securities may rest assured that their rights and interests will be as scrupulously looked after by the Government as they could be by the directors of the several railway systems." U. S. R. R. Administration Bulletin No. 4 (Revised 1919), p. 10. See also Report of Senate Committee, November 10, 1919, No. 304, 66th Cong., 1st Sess., pp. 3–12; Report of House Committee, November 10, 1919, No. 456, 66th Cong., 1st Sess., pp. 12–13; Walker D. Hines, "War History of American Railroads," p. 120–140.

States should, to a certain extent, finance the carriers until it would become possible to restore their credit, by increase of rates or otherwise. The provisions of Title II of Transportation Act, 1920, were framed to that end. Through them, the financial aid which had been given during Federal control was to be extended for a further period.

To have given priority to debts due the United States pursuant to Title II, would have defeated the purpose of Congress. It not only would have prevented the reëstablishment of railroad credit among bankers and investors, but it would even have seriously impaired the market value of outstanding railroad securities. It would have deprived the carriers of the credit commonly enjoyed from supplymen and others; would have seriously embarrassed the carriers in their daily operations; and would have made necessary a great enlargement of their working capital. The provision for loans under § 210 would have been frustrated. For, carriers could ill afford voluntarily to contract new debts thereunder which would displace, *pro tanto,* their existing bonded indebtedness. The entire spirit of the Act makes clear the purpose that the rule leading to such consequences should not be applied.

Moreover, Congress evidenced unmistakably its purpose to rely, for obtaining payment of the Government's advances, upon means other than the priority provided for by § 3466. Under all of the sections, the giving of adequate security was either required or left to the discretion of the President. Under § 210 no advance could be made, unless the Interstate Commerce Commission was satisfied that the earning power of the carrier and the security given furnished reasonable assurance that the loan would be repaid and all obligations in connection therewith would be performed.[4] The interest rate re-

---

[4] In some instances the Commission has authorized security which expressly provided only deferred liens: Loan to Chicago, Rock Island

486

quired is much greater than that which ordinarily accompanies even a business loan carrying such assurance of repayment as would have resulted from an application of the priority rule. Thus, both the general purposes of Title II and its specific provisions make it clear that Congress intended to exclude the indebtedness so arising from the scope of § 3466 of the Revised Statutes, just as under the Federal Control Act it had excluded therefrom claims incident to current operation of the railroads. *Mellon* v. *Michigan Trust Co.*, 271 U. S. 236, 240.

*Affirmed.*

& Pac. Ry., 67 I. C. C. 569; Loan to Minneapolis & St. Louis R. R., *ibid.* 580; Equipment Notes of Minneapolis & St. Louis R. R., 70 I. C. C. 67.