# MASSACHUSETTS ET AL. *v.* UNITED STATES.

No. 157.   Argued December 10, 1947.—Decided April 19, 1948.

*Alfred E. LoPresti,* Assistant Attorney General of Massachusetts, argued the cause for petitioners. With him on the brief were *Clarence A. Barnes,* Attorney General, and *John A. Brennan.*

*Helen Goodner* argued the cause for the United States. With her on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Helen R. Carloss* and *Lee A. Jackson.*

By special leave of Court, *Albert E. Hallett,* Assistant Attorney General, argued the cause for the State of Illinois, as *amicus curiae,* urging reversal. With him on the brief was *George F. Barrett,* Attorney General.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case is for all practical purposes a renewal of the litigation recently here in *Illinois* v. *United States,* 328 U. S. 8, and the companion case of *Illinois* v. *Campbell,* 329 U. S. 362. The former unanimously held that the United States has priority, by virtue of Rev. Stat. § 3466, 31 U. S. C. § 191, for payment from an insolvent debtor's estate of federal insurance contribution taxes under Title 8

and unemployment compensation taxes under Title 9 of the Social Security Act, 49 Stat. 620, as against a state's claim for unemployment compensation taxes imposed by its statute conforming to the federal act's requirements. The *Campbell* case, which was reargued on other issues, rested on this ruling for disposition of the common issue concerning the effect of § 3466.

The facts are substantially identical with those in *Illinois* v. *United States*,[1] except in two respects. One is that the fund available here for distribution is more than sufficient to pay either the Title 8 or the Title 9 taxes, though inadequate to pay both, while in *Illinois* v. *United States* the fund was not large enough to satisfy either tax in full. Here too the debtor's assignee has paid to the commonwealth the full amount of its claim,[2] while in the *Illinois* cases the fund remained in the assignee's hands for distribution.

The District Court sustained the federal priority for capital stock and Title 8 taxes in full, and for 10 per cent of the Title 9 claim. It therefore deferred payment of any part of the state's claim until those claims were fully paid. But the court held the United States not

---

[1] Here, as in that case, the debtor made a common-law assignment for the benefit of creditors. The assignee here realized $1,135.11 from sale of the assets. The claim of the United States for Title 9 taxes amounted to $963.08; for Title 8 taxes, $690.05; and for capital stock taxes, $21. The commonwealth's claim was for $803.72 in unemployment taxes. Within the time allowed, but for intervention of the insolvency, the assignee paid the state's claim in full and then paid the remaining assets of $331.39 to the collector. He applied this sum on account of the Title 8 taxes, thus leaving unpaid the federal claims for capital stock and Title 9 taxes as well as $358.66 plus interest on the Title 8 claim.

[2] The commonwealth in effect has undertaken to indemnify the assignee, by paying over to the United States the $803.72, if the payment to the state should turn out to have been erroneously made. The United States has agreed that if it prevails the judgment shall be limited to $803.72.

entitled to priority for the remaining 90 per cent of the Title 9 claim, on the ground that Title 9, § 902,[3] gives the assignee "the alternative right" to pay that amount to an approved state unemployment fund. Accordingly the judgment ordered Massachusetts to pay over to the United States, from the $803.72 received from the assignee, sufficient funds to satisfy in full the federal priorities sustained, and to retain the small balance remaining after making those payments to apply on its claim for 90 per cent of the Title 9 taxes. 65 F. Supp. 763. This action was taken in the view that, while our previous decisions had sustained the federal priority for the capital stock and Title 8 taxes, they had not determined the question for Title 9 claims.[4]

However, on appeal by both parties, the Circuit Court of Appeals held the United States entitled, under the *Illinois* rulings, to priority for the full amount of all its claims, including the Title 9 taxes. That court therefore affirmed the District Court's judgment except insofar as it denied the Government's Title 9 claim. As to this it reversed the District Court's ruling. 160 F. 2d 614.

---

[3] The original § 902, 49 Stat. 639, provided that the taxpayer might credit against Title 9 taxes 90 per cent of his contributions under an approved state program. Subsequent amendments did not alter the conception of a basic 90 per cent credit. See, *e. g.*, notes 13, 15. The present "credit against tax" section is incorporated in the Internal Revenue Code, 26 U. S. C. § 1601.

[4] The District Court thought that in *Illinois* v. *United States*, the Title 9 issue had become moot either before or as of the time the case reached this Court, and that therefore we "had no occasion to consider the problem whether as to 90 per cent of the amount due for Title IX taxes the United States [by § 902] had not given the taxpayer the option to make payment to Illinois instead of to the United States." 65 F. Supp. 763, 765. The court thus regarded the Title 9 question as left open and "nicely analyzed . . . to be one not of priority but of alternative obligation." *Id.* at 764.

Because of the obvious confusion concerning the effects of our prior decisions and the asserted differences between this case and the *Illinois* cases, certiorari was granted. 332 U. S. 754.

## I.

Massachusetts seeks to retain the entire $803.72 she has received, in priority to all the federal claims. She agrees with the district court that § 902 gives the taxpayer an "optional right" of payment, but does not accept its allocation creating priorities for all federal claims except 90 per cent of the Title 9 taxes. To sustain this broad claim would require reversal of both of the *Illinois* decisions. In no other way, on the facts, could Massachusetts retain the whole amount she was paid.[5]

Illinois as *amicus curiae* takes a narrower position, conceding that the *Illinois* cases stand as decisive adjudications of priority for Title 8 taxes but disputing that effect for Title 9 claims.[6] This position seeks an allocation paying the state's claim after the Title 8 and other federal claims, including 10 per cent of the Title 9 taxes, but before or rather in "satisfaction" of the remaining 90 per cent of them.[7]

---

[5] Since the insolvent's assets are not large enough to pay either the Title 8 or the Title 9 claim and leave enough to pay the state claim in full. See note 1.

In the brief Massachusetts states the federal question as being whether the assignee may "make payment of the State unemployment tax to the exclusion of the Federal Government claim for Title IX taxes *or any other taxes due the Federal Government* from the taxpayer?" (Emphasis added.)

[6] Illinois has appeared with leave, both by brief and in the oral argument. It neither expressly disclaims nor expressly supports Massachusetts' broad position for reversal.

[7] On the facts, see note 1, after paying the capital stock claim, the Title 8 claim and 10 per cent of the Title 9 claim, this would leave $327.75 to apply on the state's claim; and hence require Massachu-

Notwithstanding their substantial differences, the two states rest their respective positions on the same basic arguments, which upon examination turn out to be identical with those vigorously presented by Illinois in the earlier cases, except for wording and detail. Much is made of the fact that here the debtor's assignee has paid to the commonwealth the full amount of its claim, while in *Illinois* v. *United States* the fund remained in the assignee's hands. Both states urge that § 902 gives the taxpayer, and here his assignee, the "optional right" of payment to the state. Moreover, with respect to the requirement of Rev. Stat. § 3466 that "the debts due to the United States shall be first satisfied," it is said that payment to the state with resulting credit to the United States for 90 per cent of the Title 9 claim "satisfies" the Government's debt as much as payment to it in cash.

In the *Illinois* cases the foundation for the state's claim to be paid in preference to any of the federal claims lay in the credit provision of § 902, which is the identical provision for "optional payment." There was no question whatever that § 902 gave the taxpayer the "alternate right." But the precise issue in both cases was whether that right had been cut off by Rev. Stat. § 3466 when he became insolvent.

Obviously there could have been but little point or effect to our decisions if, despite them, the assignee could have turned around immediately and deprived the Government of the priorities established simply by exercising a right to make the optional payment to the state. Nor would the decisions have been much more sensible or

---

setts to pay over to the United States $475.97 plus interest from the $803.72 she has received, in order to complete the payment in full of the Title 8 claim.

Actually this represents the District Court's specific allocation, not exactly that of either Massachusetts or Illinois. Each would apply a somewhat different method of allocation. See note 20.

effective, had they purported to sustain the federal priorities when the assignee has retained the fund, but to disallow them if he has paid the state before the federal claims are filed. We made no such ineffective or capricious rulings. The decision was broadly that by intervention of the insolvency and the consequent bringing of Rev. Stat. § 3466 into play, the taxpayer's right to pay the state and take federal credit had been cut off.[8]

Our decisions went to the merits of that right and not merely to rule that the state was not a proper party to enforce its exercise. The taxes due the United States were held to be debts; and by virtue of § 3466 the debtor's prior obligation attaching as of the date of his insolvency was to the Government, not to the state. It followed necessarily that the assignee could not "satisfy" it by paying the state and giving the Government "credit." This was the very question at issue and the one adjudicated. The "alternate right" contention and the one that "satisfied" in § 3466 means "credit" are only verbal redressings of the basic issue decided in the *Illinois* cases.

## II.

This is as true of the argument's bearing on Illinois' narrower position as it is for Massachusetts' broader one. But Illinois, apparently with Massachusetts' support, brings forward to sustain the less sweeping attack the additional contention that the *Illinois* decisions did not adjudicate Title 9 priority, although purporting to do so. Moreover, the facts present this narrower issue of distinguishing between Title 9 and other federal claims in sharper factual focus than did the *Illinois* cases. For

---

[8] See Part III. The federal priority under § 3466 attaches from the time the insolvent debtor transfers or loses control over his property. *Illinois* v. *Campbell,* 329 U. S. 362, 370; *United States* v. *Waddill Co.,* 323 U. S. 353, 355–358; *United States* v. *Oklahoma,* 261 U. S. 253, 260.

if the capital stock and Title 8 claims are first paid in full, as the District Court required, a small balance of the fund will remain, to be applied either in part payment of the federal Title 9 claim or in some form of allocation between it and Massachusetts' claim. This was not true of *Illinois* v. *United States*, or indeed of *Illinois* v. *Campbell*, in the posture in which that case was brought here.

The principal argument is that the Title 9 taxes, though litigated in the Illinois courts, were not involved on the facts in the *Illinois* cases as they came to and were decided by this Court. Hence it is said we did not acquire jurisdiction over the Title 9 claims. The argument is correct concerning *Illinois* v. *Campbell*.[9] But it is surprising as applied to *Illinois* v. *United States*, in view of the state supreme court's adverse decision on the Title 9 issue; Illinois' explicit application for certiorari on that issue and argument on the merits here to reverse the state court's decision;[10] the necessity on the facts for the state

---

[9] The state supreme court's judgment had sustained the federal priority for Title 8 taxes, ordering them paid first and the small remaining balance of about $150 to be paid to the state. This left the Title 9 taxes unpaid. The court denied priority for that claim because it fell within the explicit exception of § 602 (b) of the Revenue Act of 1943. See text *infra* at notes 13, 14. The Government's failure to apply for certiorari as to the $150 eliminated the Title 9 issue from the case in this Court.

[10] Illinois almost uniformly put the issues as involving Title 8 and Title 9 taxes indiscriminately. Thus, in stating "The Questions Presented," the petition for certiorari spoke of priority for "Social Security excise taxes and Capital Stock taxes," necessarily encompassing Title 8 and Title 9 levies. This was repeatedly true of the state's brief. Further, the petition at one point said: "In holding that the claim of the petitioner was subordinate to the claims of the United States for capital stock tax and for taxes arising under Titles VIII and IX of the Social Security Act, the Supreme Court of Illinois looked to form, not substance, and disregarded the character and significance of petitioner's claim." The Government's briefs were equally positive in seeking disposition of the Title 9 claim.

to bring the question up and secure reversal in order to establish its claim;[11] and finally our opinion's clear and explicit terms, indeed emphasis, in deciding the Title 9 issue, together with the Title 8 one, against Illinois.[12]

The idea that the state court decided only the Title 8 issue completely misconceives its action, and serves only to confuse the judgment in that case with the one in *Illinois* v. *Campbell*. Indeed it seeks to infuse into the former the latter's denial of Title 9 priority. Not only is this wholly incompatible with Illinois' earlier position; it ignores the fact that the state court disposed of the Title 9 issue in both cases, but in opposite ways on entirely different facts and legal issues.

---

[11] The federal claims asserted were as follows: Capital stock taxes, $58.73; Title 8 taxes, $1,065.52; Title 9 taxes, $1,284.36; all plus interest from the date due. The Illinois claim for state unemployment compensation contributions was $721.29. And the fund available to satisfy all these claims was $1,010.81.

Since the assets were insufficient to pay in full either the Title 8 or the Title 9 claim, Illinois had to override both to establish her claim. Illinois recognized this both by her application for review and by the broad argument that the state claim was tantamount to a federal tax and the credit provisions of § 902 exempted it completely from the priority of Rev. Stat. § 3466 for all federal taxes, not simply one.

[12] The opinion in *Illinois* v. *United States* explicitly stated: "The claim of the United States is for federal unemployment compensation taxes under Title 9 and federal insurance contributions taxes under Title 8 of the Social Security Act, 49 Stat. 620." 328 U. S. 8, 9. The opinion throughout treated Title 9 taxes on a parity with those under Title 8. We accepted fully the state's view that the credit or "optional payment" provision of § 902 was designed to stimulate the creation of sound state systems. 328 U. S. 8, 10. See *Illinois* v. *Campbell*, 329 U. S. 362, 367, n. 5. But we rejected the argument that the state claim was tantamount to a federal one and said: "But we cannot agree that Congress thereby intended in effect to amend § 3466, by making its priority provisions inapplicable to state unemployment tax claims." 328 U. S. 8, 11. The ruling applied to both types of tax without distinction.

In *Illinois* v. *Campbell*, the state court did not reach the basic question of the force of Rev. Stat. § 3466 to create priority for federal Title 9 claims; rather, it expressly avoided deciding that question. 391 Ill. 29, 32. This was because the insolvent's assets were in the hands of a court-appointed receiver, *id.* 31, and in that situation § 602 (b) of the Revenue Act of 1943, 58 Stat. 77,[13] expressly allowed the receiver to pay the state and take credit up to 90 per cent of the Title 9 tax. The Illinois Supreme Court expressly so held, and on this ground alone denied the federal Title 9 claim. 391 Ill. 29, 34. The effect was to rule that § 602 (b) created a legislative exception to § 3466, limited to payments by such receivers, within the times and for the tax periods specified, up to 90 per cent of the Title 9 taxes.[14]

---

[13] This section was one of the relaxing amendments, see Part IV, to Title 9, § 902, of the Social Security Act. For Title 9 taxes due for the years 1939, 1940, 1941 and 1942 it allowed credit up to 90 per cent, without regard to previous failure to pay as required, if the assets of the debtor had been, during the period specified, "in the custody or control of a receiver, trustee, or other fiduciary appointed by, or under the control of, a court of competent jurisdiction."

Section 602 (a) of the 1943 Act, 58 Stat. 77, also created a similar relaxation of § 902, for Title 9 taxes due for the years 1936, 1937 and 1938, with credit limited however to 81 per cent, when the state payments for those years were made after December 6, 1940. This section formed the basis for a claim to credit in *Illinois* v. *United States* rejected by the Illinois court. See note 15.

[14] See also Part IV. The court, however, in giving directions for the decree to be entered by the trial court ordered the federal Title 8 claim paid first in full "and any balance remaining" to the state. 391 Ill. at 46; see also *id.* 42. Thus apparently it inadvertently lost sight of the fact, earlier expressly noted, *id.* 34, 39, that § 602 (b) allowed the receiver to take credit only up to 90 per cent of the Title 9 taxes.

This oversight seemingly was responsible for the court's failure to award priority to the United States for 10 per cent of its Title 9 claim, from the small balance remaining after paying the Title 8 taxes. Cf. note 9. Had this amount, some $128, also been awarded

But § 602 (b) did not apply in *Illinois* v. *United States,* because the insolvent's assets were held by a common-law assignee, not a court-appointed official.[15]  So holding, 391 Ill. at 37, the Illinois court went on to rule that the federal claims for Title 8 and Title 9 taxes were debts within the meaning of § 3466 and were therefore entitled to priority over the state's claim.  It not only rejected the argument that the credit provision of Title 9, § 902, made that claim "in reality a claim of the Nation . . . tantamount to a claim of the United States,"[16] but also carefully guarded the wording of the opinion's dispositive paragraphs[17] and the directions given the trial court for entering the judgments on remand so as to differentiate

to the United States, roughly only $22 would have been left for the state.  The opinion gave no consideration to this question, and by the Government's failure to apply for certiorari regarding it we were prevented from considering it.

[15] An additional reason was that the taxes against which credit was claimed were not taxes for the years to which § 602 (b) expressly limited the credit it allowed.  Instead § 602 (a) of the 1943 Act, see note 13, allowed conditional credit for the tax years involved in *Illinois* v. *United States* and the state sought to secure it.  But the Illinois court held § 602 (a) also inapplicable on the facts and denied the 81 per cent credit because the assets were in the hands of a common-law assignee, not in the custody or control of a court-appointed receiver or other official as the section required for the credit to be available.  391 Ill. at 37.

[16] 391 Ill. at 39, 40; cf. 328 U. S. at 11.  The Illinois court held "the full amount" of the payroll (Title 9) taxes to be "taxes due the Federal government."  In the first instance, it said, this was true of "100 per cent of the taxes levied," which "continues to be taxes due the Federal government either until it is all paid to the Federal government, or 90 per cent is paid to the State and the balance to the Federal government."  The provisions for credit, the opinion continued, "do not change the character of the taxes imposed.  They are still taxes due the Federal government and constitute a debt due to the United States within the purview of section 3466 of the Revised Statutes."  *Id.* 40, 41.

[17] 391 Ill. 42, 46.

the two cases and to avoid any direction that the fund in *Illinois* v. *United States* apply on only one of the federal claims.[18] The judgment thus left the United States free to apply it in partial satisfaction of either claim or both.

This was also the effect of our own decision and judgment. It generally and without distinction between the Title 8 and Title 9 claims adjudicated priority for both. As in the Illinois court's decision, no restriction was placed upon allocation of the fund, nor is any hint to be found in the opinion that such an allocation was intended. Indeed we were not asked to make one and to have done so would have disregarded the basic position of both parties, each of which sought a full and favorable disposition of the controversy including decision upon all the issues presented.[19]

It is true that, as in the Illinois Supreme Court, the decision and judgment could have been made on the narrower basis that the Title 8 claim was more than sufficient to exhaust the fund, and therefore to sustain the priority for that claim alone would dispose of the case. But this would have been equally true of the Title 9 claim. Neither claim was either more or less essential to decision than the other, indeed decision upon both was necessary to a judgment favorable to Illinois. To have eliminated either would have required some in-

---

[18] *Ibid.* The order for judgment in *Illinois* v. *United States* merely reversed the trial court's judgment and remanded the cause "with directions to enter a decree finding that the United States is entitled to priority of payment to the extent of the funds on deposit, and ordering distribution accordingly." 391 Ill. at 46. See note 14 for the directions in the *Campbell* case.

[19] See notes 10, 11. The cases were obviously test cases designed to settle the question of priority generally, *i. e.*, not merely for one but for all federal taxes and thus provide a certain basis for administration of the Social Security Act in both its insurance and its unemployment compensation features.

dication of that purpose. Since none was given, it cannot be said that the judgment rested on the one ground or claim more than the other.

While therefore the case is one which might have been decided on either of two independent grounds favorably to the Government, it is neither one in which that course was followed nor one which could have been determined the opposite way in that manner. Instead, as we were asked to do and rightly could do on the record and the issues, we decided both issues, and the judgment rested as much upon the one determination as the other. In such a case the adjudication is effective for both. *United States* v. *Title Ins. Co.,* 265 U. S. 472; *Union Pacific Co.* v. *Mason City Co.,* 199 U. S. 160; see *Richmond Co.* v. *United States,* 275 U. S. 331, 340.

## III.

Finally, it is urged that in *Illinois* v. *United States* we had no occasion to consider and hence our opinion did not discuss whether in a case like this, where the fund is more than sufficient to pay all federal claims except 100 per cent of the Title 9 claim, the balance remaining after paying those other claims must go first to pay the federal Title 9 claim in full, or may be allocated between that claim and the state claim to pay 10 per cent of the federal claim first and then to apply what remains on the state claim.[20]

---

[20] Cf. the District Court's view, note 4 *supra;* and note 7. Illinois and Massachusetts in fact urge different methods of allocation, each differing from the one applied by the District Court. From the funds available for Title 9 distribution, Massachusetts would pay the state claim first and correspondingly reduce the federal claim. Illinois would make a *pro rata* distribution of 10 per cent of the available funds to the Federal Government and 90 per cent to the state, while the District Court would pay the federal 10 per cent first and apply the balance remaining on the state claim.

Closely related to this, though not involved on the facts in *Illinois* v. *United States* or here,[21] is the Government's apparent concession that if all the federal claims are paid in full, including 100 per cent of the Title 9 claim, and any balance then remains in the fund, the insolvent taxpayer is nevertheless given the right by § 902 to pay that balance to the state and receive credit on his federal Title 9 tax. In such a case, it is said, the Government would be overpaid on Title 9 taxes and obligated to refund the excess. Then the taxpayer could apply the amount received in further payment of the state claim, with corresponding federal credit, overpayment and refund, only to start the cycle again and repeat it until he had paid the state its claim in full and received the entire 90 per cent credit.[22] Hence in this situation, it is said, short-cut distribution might well be made to the state in the first place, to eliminate the cycle.

The effect of the concession, if it is valid, goes far toward cutting the ground from beneath the Government's basic position.[23] That effect is heightened by the further surprising statement in its brief that in a case like this, not covered by the concession, compliance with the credit conditions of § 902 becomes impossible "not because Section 3466 operates to exclude Section 902 or to nullify it, but because the terms of Section 902 itself deny it [credit] where no payment can be made." The state-

---

[21] Since the fund was not large enough in either case to pay all the federal claims in full.

[22] Hypothetical examples are stated in the District Court's opinion, 65 F. Supp. 763, and in the briefs filed here.

[23] Possibly the concession was intended as an argumentative alternative to other and broader positions. In any event, we are not bound to accept it as either sound or conclusive of the litigation. It is not, even in terms, a confession of error.

These observations apply equally to the Government's further damaging statement set forth in the sentence following the one to which this footnote is appended.

ment would be understandable, if it had been that § 3466 and § 902 both work to deny the credit in this situation. But to say that § 3466 has no effect to cut off the right to credit either in the present situation or in the different hypothetical one stated is to take away the basic grounding of all federal priority as against the state's claim.

The concessions cannot be accepted. In the first place, the effect of § 3466 depends on the fact of insolvency, not on the degree of it as the first concession seems to contemplate. And it is only by force of § 3466 that the Government has any priority at all. Section 902 may work to deny credit, if its conditions for credit are not fulfilled. But it does not give federal priority over valid state claims. Moreover, both concessions are altogether inconsistent with the basic decisions in the *Illinois* cases and the grounds on which they rested. The matter requires brief restatement. It is one which goes fundamentally to the effect of Rev. Stat. § 3466, as distinguished from, though not unrelated to, § 902 of the Social Security Act. These of course are entirely distinct statutes, with different functions.

Rev. Stat. § 3466 gives priority explicitly for *"debts* due to the United States" and the priority given is in terms absolute, not conditional. Once attaching, it is final and conclusive. A long line of decisions has held that taxes due the Government are "debts" within the meaning of the section.[24] In the *Illinois* cases we applied this ruling to Title 8 and Title 9 taxes as against the state's claim

---

[24] The federal priority has been uniformly sustained for tax claims. *United States* v. *Waddill Co.,* 323 U. S. 353 (unemployment compensation taxes and a debt arising out of a Federal Housing Administration transaction); *United States* v. *Texas,* 314 U. S. 480 (gasoline taxes); *New York* v. *Maclay,* 288 U. S. 290 (income taxes and a claim for expenses incurred in the replacement of a buoy damaged by the insolvent); *Spokane County* v. *United States,* 279 U. S. 80 (income taxes and penalties); *Price* v. *United States,* 269 U. S. 492 (income

for "contributions." Prior decisions also have held that the priority attaches as of the time of the insolvency,[25] a ruling also applied in the *Illinois* cases.

But if credit can be taken after § 3466 attaches, *i. e.,* after insolvency, effective to set aside the federal priority up to 90 per cent of the Title 9 claim, the priority to that extent becomes conditional, not absolute. Its effectiveness then becomes contingent upon the happening of subsequent events, namely, the concurrence of the conditions of § 902 for paying the state and taking the credit together with the taxpayer's election to do this. In short, § 3466 never conclusively attached and § 902 works retroactively on occurrence of those contingencies to upset the priority.

A further effect might be to make the statute applicable beyond the scope of the term "debts due to the United States." For if the taxpayer's subsequent election can destroy the priority retroactively, not only the priority but the "debt" itself becomes contingent. And it is at

---

taxes and customs duties); *Stripe* v. *United States,* 269 U. S. 503 (income, excess profits, and capital stock taxes).

Judgments recovered by the United States also are debts entitled to priority. *United States* v. *Knott,* 298 U. S. 544 (against surety on estreated bail bonds); *Hunter* v. *United States,* 5 Pet. 173 (against surety).

Other debts for which the Government has been held to have priority under § 3466 are: *United States* v. *Remund,* 330 U. S. 539 (emergency loans made by Farm Credit Administration); *United States* v. *Emory,* 314 U. S. 423 (sum due on note held under the National Housing Act); *Bramwell* v. *U. S. Fidelity Co.,* 269 U. S. 483 (Indian funds deposited in bank); *United States* v. *National Surety Co.,* 254 U. S. 73 (losses where contractor defaulted); *Bayne* v. *United States,* 93 U. S. 642 (misappropriated Army paymaster funds); *Lewis* v. *United States,* 92 U. S. 618 (funds held by Navy disbursing agents); *United States* v. *State Bank of North Carolina,* 6 Pet. 29 (bonds for customs duties); *United States* v. *Fisher,* 2 Cranch 358 (claim against endorser of protested bill of exchange).

[25] See note 8 *supra.*

least doubtful on the statute's wording that obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency can be said to fall within the reach of "debts due" as of the time of insolvency.[26]

However this may be, we know of no previous application of § 3466 creating such a conditional priority.[27] Nor do we see how one could be made consistently with the section's terms or purposes. The only such consistent application would seem to be one giving the Government the prior and indefeasible right to take the fund available, up to the amount necessary to pay its claim as of the date the priority attaches, not as it may be affected by later contingencies other than payment.[28] In enacting § 3466 Congress gave no indication whatever of intent to create defeasible priorities.

The defeasance conceded possible by the Government, therefore, together with the further conceded ineffective-

---

[26] It has been held that the term "debts due to the United States" should be construed with some liberality. See, e. g., Price v. United States, 269 U. S. 492, 500; United States v. Emory, 314 U. S. 423, 426. And there is apparently no decision expressly ruling the matters of contingency of the obligation or of the priority upon subsequent events not certain. Cf. United States v. Marxen, 307 U. S. 200. But the fact that the problem has not squarely arisen in the long history of § 3466 and that all of the decisions sustaining the priority were for debts clearly due and owing, adds force to the clear inferences implicit in the statute's wording, viz., that Congress not only created a conclusive priority attaching as of the time of insolvency but in doing so drew the line for its operation close to, if not at, the commonly accepted meaning of "debt" as distinguished from other forms of obligation.

[27] See notes 24, 26.

[28] Again the distinction between "payment" and "satisfaction" becomes pertinent. To construe the term "satisfied" in § 3466 as being fulfilled by taking subsequent credit, as the states urge, would be to qualify the word "debts" so as to make it include conditional obligations.

ness of § 3466 (though not of § 902) in circumstances like these to deny the right to credit, destroys the fundamental character of the priority created by § 3466 and thereby removes the foundation from the Government's basic position, which is that § 3466 applies as of the time of insolvency to create the priority it contemplates. Through these concessions the section is made, by virtue of the effect of § 902, to create only a defeasible federal priority as against claims for credit. This actually is but another way of making § 902 effective as an exception to Rev. Stat. § 3466, like § 602 (a) and (b) of the Revenue Act of 1943, noted above in Part II.

This of course was Illinois' earlier position, rejected by this Court. If that position is now to be accepted, we do not see how § 3466 can be regarded as applying to Title 9 taxes or, indeed, how the effect of treating § 902 as an exception can be limited to Title 9 taxes. For if § 902 works as an exception to § 3466, then Illinois was right in the first place, and the exception would seem to apply to all federal taxes, not just the one.[29]

Accordingly, the Government's concessions cannot be accepted as consistent either with our prior decisions or with its own basic position in the *Illinois* cases and this one. That position, apart from the concessions, rests ultimately on § 3466 and its applicability to these claims.

---

[29] Congress, of course, could provide for federal priority as to all taxes except Title 9 claims. But, apart from the explicit exceptions created by § 602 (a) and (b) of the Revenue Act of 1943 with reference to funds of insolvents in the hands of court-appointed officials, see Part II, notes 13, 15, Congress has not done so either by any wording or intent of Rev. Stat. § 3466, nor in our view by § 902 of the Social Security Act. We do not think that it intended to make the state's claim subject to all other federal taxes, but prior to all but 10 per cent of the Title 9 taxes. See text *infra* Part IV. No instance has been found where § 3466 has been applied to create such a selective priority as among federal claims qualifying as "debts" within the meaning of § 3466.

This necessarily denies that § 902 creates an exception to § 3466 or a qualification inconsistent with its terms. The qualifications now conceded are not consistent with those terms, for they do not contemplate the tenuous, destructible sort of "priority" the concessions involve.

Moreover, the fact that in *Illinois* v. *United States* we did not discuss expressly the 10–90 per cent distribution of Title 9 taxes now suggested does not mean that our decision did not encompass that possibility. It extended generally to all cases where credit is sought after insolvency. It was federal *priority* attaching as of the time of insolvency that we adjudicated, not something less. As we have indicated, in making the adjudication we neither were nor could have been ignorant of § 902's allowance of the taxpayer's election. Our decision held that right cut off by the incidence of § 3466 at the time of insolvency. Any other would have been wholly inconsistent with the ruling that § 3466 applies as against the state's claim for "contributions" or the taxpayer's right to make them after the incidence of his insolvency.

## IV.

We have taken pains to state the effect of our previous decisions, because of the confusion concerning them and the fact that two states have earnestly presented the questions. Ordinarily this would end the matter. But, again for those reasons, we turn briefly to the merits and to the question whether the *Illinois* decisions should now be reversed.

Apart from the arguments already discussed, two stand out as reasons for the change sought. Both reiterate contentions rejected in the *Illinois* cases. The primary one is that the objects of the legislation will be defeated unless the change is made, namely, the encouragement of the state systems and correspondingly of taxpayers to make "contributions" to state funds, thereby insuring that

the moneys so paid in will go out for unemployment benefits rather than into the Treasury as revenue. The second is a heightened emphasis on the subsequent amendments to § 902 as showing Congress' intent to waive, in progressively broadening scope though still only in specified situations, the original limitations of § 902 upon securing credit.[30]

From the second contention is drawn the conclusion that Congress, by its carefully, even meticulously drawn relaxations, meant credit to be given not only in the circumstances so carefully prescribed but also in other situations not within those prescriptions. This conclusion when added to the first argument amounts in sum to reiterating that the state exaction is "tantamount to a claim of the United States," and that not to disregard the tax and credit structure in which Congress molded the Act would be to "observe the form and ignore the substance of the legislation."

We shall not repeat the answers made in *Illinois* v. *United States,* except to say that "while the state and federal governments were to cooperate, the underlying philosophy of the Federal Act was to keep the state and federal systems separately administered." 328 U. S. 8, 11. To the considerations there stated, however, we now add the following ones, not expressly mentioned in the earlier opinion, prefaced however with the observation that the grounding of each plea for reversal affords basis for conclusion against that action as well as in its favor.

Thus the many relaxations which Congress has made respecting the conditions permitted for taking credit, by force of their very number and careful limitation, show

---

[30] Of the several amendments, none is applicable to this case. The only ones relating expressly to insolvents' estates are those noted in Part II, see notes 13, 15 and text, 31, applying to payments by court-appointed receivers, etc.

that Congress was not offering a broadside exemption to be applied in situations, such as this case, other than those specifically defined.[31]   Rather the intention disclosed is to limit the credit to the precise situations specified for allowing it.   That view accords with Congress' deliberate choice of the tax and conditional credit devices for framing the Act's structure.   These are well-known techniques, adopted apparently in this instance for constitutional as well as administrative reasons.[32]   But those very motivations warn us to be wary of disregarding the form which Congress has chosen advisedly, in order to substitute a substance we can only be doubtful it may have intended.[33]

But it is said that if payment to the state is not allowed and the right to receive credit is cut off, the money will not be paid out in unemployment benefits but will go into the Treasury as general revenue; the states will be compelled to make payments to the insolvent's employees;

---

[31] Thus, as has been noted, the provision for payment and credit given by the Revenue Act of 1943, §§ 602 (a) (3) and (b), 58 Stat. 77, is limited to situations where an insolvent's assets were under the control of a court or its appointed official.   Congress quite obviously had the insolvent taxpayer in mind.   But even so it excluded non-judicial custodians of his assets by its failure to extend the relaxation to them.   The omission cannot be taken to have been unintentional The necessary effect in the one case was to create a legislative exception to § 3466, in the other to deny it by the withholding of the like privilege.   So also with the other easing amendments.

[32] Cf. *Steward Machine Co.* v. *Davis*, 301 U. S. 548.

[33] It is precisely in matters where Congress has used the tax and credit technique that disregarding the form chosen offers the gravest dangers of perverting a statute's purposes.   We think that possibility is equally as great here from ignoring Congress' expressed intent, both in limiting the right of credit to defined situations and in its failure expressly to qualify the broad policy of § 3466, as would be the other one of reaching its purpose by giving effect to its explicit limitations.

and thus the primary purposes of the Act will be defeated. There are several answers.

One is that Congress has guaranteed the solvency of the state funds and, if need be, the revenues thus paid into the Treasury will be available for that purpose.[34] Moreover, but especially in view of this guaranty, it may be more likely that the funds, if paid into the Treasury rather than to the state, will be saved for application to the Act's purposes. For there is no assurance, if the state's prior right to them is once established, that they will go for the payment of unemployment benefits.

It must be remembered that we are dealing with an insolvent's assets. And the states have statutes by which such assets are distributed according to local priorities whenever § 3466 is not operative. Only a few of them place unemployment benefits at the top.[35] Depending therefore upon the number and the amounts of claims standing ahead of the unemployment benefit claims in the particular state would be the certainty or probability of payment of the latter. In short, reversing our decisions and conceding the validity of the state's position, either as to Title 9 taxes alone or as to all federal taxes, would give no definite and certain assurance that the funds thus acquired by the states would go to satisfy the Act's

---

[34] Sections 904 and 1201 of the Social Security Act, 58 Stat. 789, 50 U. S. C. App. (Supp. V, 1946) §§ 1666–1667, as amended, 61 Stat. 793, 794, §§ 4–5. Section 904 established a federal employment account in the United States Treasury, and appropriated the excess of Title 9 taxes over unemployment administrative expenses to such account. Section 1201 authorized loans from such account to the states for unemployment insurance payments when a state's unemployment insurance fund becomes dangerously low, repayment of such advances not being required unless the state fund regains a stable condition. See S. Rep. No. 477, 80th Cong., 1st Sess. 9–10.

[35] See, e. g., Mass. Ann. Laws, c. 151A, § 17 (1942); Cal. Gen. Laws, Act 8780d, § 46 (1944); Iowa Code, § 96.14 (3) (1946); Okla. Stat., tit. 40, § 224 (c) (1941).

purposes.[36]  In many cases payment to the state would be the means of diverting them to wholly extraneous objects.  Especially would this be true when smaller employers within the Act's terms are involved, as they seem to be much more often than others.[37]  In the absence of any explicit or clearly implied direction we do not believe that Congress intended to require that the state's claim for unemployment contributions take precedence over all other debts of the insolvent or to authorize us to make this a condition of allowing payment to the state to be made from his estate.  There was no evident purpose thus broadly to upset state schemes of priority.

These examples are enough to show that the premises of the states' contentions are capable of supporting other conclusions than they draw from them.  Other examples might be stated.  But in each instance the inferences drawn by the states are counterbalanced with opposing ones quite or nearly as tenable.  In some they are of greater weight.

It follows that Massachusetts and Illinois have not shown the clear inconsistency between the Act's explicit

---

[36] Unless in this case we should undertake to say, as we have not been asked or authorized to do, that by implied force of § 902, state priorities are relegated to a position inferior to the taxpayer's right to pay the state and take federal credit.  Nothing in the statute suggests that Congress intended to give the taxpayer or this Court the power thus to disorder the states' schemes of priorities.

[37] If the litigated cases, of which the ones that have come here seem to be typical, and common observation may be taken as fairly accurate bases for judgment.

It is true that in some cases of insolvency the business continues without being wound up.  But this perhaps is much more often the case when operation is continued under judicial control than otherwise.  And when that is the situation, insofar as the 1943 amendment applies the payment may be made and credit obtained.  Insofar as it does not apply the amendment is a clear mandate against allowing that to be done.

terms and our previous decisions, on the one hand, and achieving the Act's purposes, on the other, which is necessary to make out a case for reversal and thus for negating the force of Rev. Stat. § 3466 as creating federal priorities for Title 9 or other federal tax claims. The *Illinois* decisions were advisedly made, after full deliberation. There was no dissent on the basic question of priority, even though the issue seemed close. No substantially new argument or consideration of policy has been put forward. The case for reversal is no more clear or convincing than Illinois' position on the merits in the earlier litigation.

Nor are we persuaded that our former decisions were erroneous. For the strict policy of § 3466 had permitted few exceptions [38] and, as we repeated in *Illinois* v. *United States,* quoting *United States* v. *Emory,* 314 U. S. 423, 433, "only the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466." 328 U. S. 8, 12. See also *United States* v. *Remund,* 330 U. S. 539, 544–545. There is no such inconsistency here.

Until the federal claims for taxes, whether under Title 8, Title 9 or other taxing provision, are paid in full, the

---

[38] The original departures indeed did not contemplate that exceptions were being made. They conceived that the funds or property affected, being covered by mortgage, belonged in fact to third persons, not to the insolvent debtor. *Thelusson* v. *Smith,* 2 Wheat. 396, 426; *Conard* v. *Atlantic Ins. Co.,* 1 Pet. 386; *Brent* v. *Bank of Washington,* 10 Pet. 596, 611; see *Savings Society* v. *Multnomah County,* 169 U. S. 421, 428; cf. *United States* v. *Fisher,* 2 Cranch 358; *United States* v. *Hooe,* 3 Cranch 73. The Court has been loath to expand these exceptions, cf. *Illinois* v. *Campbell,* 329 U. S. 362, 370, to include other types of lien. The claims of Massachusetts and Illinois do not fall within the scope of those exceptions or of others as to which the Court has felt that subsequent legislation authorized them. Cf. *Cook County National Bank* v. *United States,* 107 U. S 445; *United States* v. *Guaranty Trust Co.,* 280 U. S. 478.

states are not entitled either to collect or to retain any part of the insolvent debtor's assets. We do not anticipate that any of the state unemployment insurance programs will fail or be seriously impaired by reason of this decision, or their consequent failure to secure the small sums characteristically at stake in this extended litigation and, apparently, in other cases most likely to produce similar controversy. Nor would the Federal Treasury have been rendered bankrupt by a contrary result.

The judgment of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE JACKSON, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE DOUGLAS and MR. JUSTICE BURTON join, dissenting.

This decision announces an unnecessarily ruthless interpretation of a statute that at its best is an arbitrary one. The statute by which the Federal Government gives its own claims against an insolvent priority over claims in favor of a state government must be applied by courts, not because federal claims are more meritorious or equitable, but only because that Government has more power. But the priority statute is an assertion of federal supremacy as against any contrary state policy. It is not a limitation on the Federal Government itself, not an assertion that the priority policy shall prevail over all other federal policies. Its generalities should not lightly be construed to frustrate a specific policy embodied in a later federal statute.

The Federal Government has sued to enforce a personal liability against one who, as assignee, paid to the State of Massachusetts funds which the Federal Government claims by virtue of its statutory priority. Defendant was the assignee of a small concern under a common-law assignment for benefit of creditors. The assets did not

realize enough to pay both federal and state tax claims. The United States filed a claim, among other things, for 100% of the taxes laid by Title 9 of the Social Security Act, which, however, provides for a 90% credit against the federal tax if that amount has been paid into an approved state unemployment compensation fund. Believing that he was entitled thereby to pay the State and to claim the credit against the federal tax, this assignee paid $803.72 on the claim of Massachusetts for taxes under the Massachusetts Unemployment Compensation Act. This is the sum now demanded by the Federal Government.

The reasoning on which the assignee is held liable and the State is required to turn this amount over to the Federal Government is this: True § 902 gives a 90% credit. But, literally, it is only for actual payment to the State. On insolvency, the federal priority statute, so it is held, intervenes and freezes the funds in the assignee's hands so that he cannot pay the State until he has first paid the Federal Government. Hence, unless he has enough money to pay both claims in full, the priority statute prevents him from taking the credit which the Social Security Act grants him, the Federal Government collects a windfall ten times what would normally be its due, and the State government gets nothing on its tax claim. This Court now so construes the priority statute as not merely to prefer net claims of the Federal Government, but also as a prohibition against courts marshaling the assets of an insolvent in an equitable manner.

The District Judge declined to support this harsh reasoning. He is one whose views of the meaning of the Social Security Act are entitled to great weight, because of his experience with it. See *Steward Machine Co.* v. *Davis*, 301 U. S. 548, at 553. He considered that as to 90% of the federal tax, the taxpayer in effect was given an option to pay it to the approved state fund or to the Federal Government. He said:

"The force of that analysis seemed to me the more persuasive when the true nature of Title IX of the Social Security Act as portrayed in Charles C. Steward Machine Co. v. Davis, 301 U. S. 548, . . . was stressed. As to 90 per cent of the taxes under that title the objective of Congress was not to collect federal revenues but to stimulate the creation of and payment to state unemployment compensation funds. It would defeat obvious Congressional intent to lay down a rule which required that this 90 per cent should go to satisfy a Title IX tax claim instead of going to the direct benefit of claimants under state unemployment compensation plans."

The consequences of this Court's refusal to follow his reasoning are so inconsistent with the purposes of the Social Security Act that they could not have been intended by a reasonable Congress. What the Court is doing practically is this:

1. The Court is giving the Federal Treasury a payment from an insolvent taxpayer ten times as large as Congress exacted from a solvent taxpayer under like circumstances. The 90% was never contemplated as federal revenue, but credit for that amount was intended to be availed of, to induce states to create unemployment compensation funds and to maintain them in solvent condition.

2. The Court is depriving the State of a revenue Congress not only tried to assure it, but one which it used the tax and credit device to impel the state to collect. See *Steward Machine Co.* v. *Davis,* 301 U. S. 548.

3. This unjust enrichment of the Federal Government and the depletion of state unemployment funds is accomplished by holding that the priority statute prohibits simultaneous distribution to each, State and Federal Government, of the net amount actually due, taking into account such simultaneous payments, and by requiring

instead that the total federal tax be paid in full and first in point of time, which in this case depletes the estate so that the assignee cannot thereafter make the state payment to obtain the federal credit. It seems to me that the federal priority statute cannot have been intended to do more than secure to the Federal Government what becomes fairly due it on a marshaling of assets as courts of equity usually do.

4. This interpretation prejudices general creditors by placing ahead of them $190 of tax claims for every $100 actually owing. For example, the maximum tax for both the State and Federal Governments is that laid by the Federal Act—let us say it amounts to $1,000. It can be discharged by payment of $1,000, $900 paid to the approved state fund and $100 to the Federal Government. But under this ruling the insolvent must pay the $1,000 in full to the Federal Government. That, of course, leaves the state tax undischarged, which calls for payment of another $900 before anything can be left for the general creditors. Thus, where an equitable marshaling of assets to pay just claims would put $1,000 of taxes ahead of general creditors, the Court's ruling puts $1,900 ahead of general creditors. The Court even goes so far as to reject concessions by the Government designed to mitigate, in this respect at least, the harshness of this rule.

The interpretation of the Priority Act to thus gouge the states and private creditors is contrary to the purpose and spirit of the Act itself. Over a century ago Mr. Justice Story defined the "motives of public policy" which underlie the priority statutes of the Federal Government to be "in order to secure an adequate revenue to sustain the public burthens and discharge the public debts. . . ." *United States* v. *State Bank of North Carolina* (1832), 6 Pet. 29, 35. It is obvious that as to the

90% of the Social Security tax here involved, it was not contemplated as federal revenue to meet federal burdens but was laid to induce and to enable the State to assume specific obligations to the unemployed. The priority statute is now invoked to deny, in this class of cases, the aid promised in meeting these obligations.

When a later statute has enacted a comprehensive federal policy in another field and created a federal interest in the adverse claimant's solvency or function, this Court has rarely, and never until recently, hesitated to interpret the old and general priority statute as yielding to the newer and specific statutory scheme. *Cook County National Bank* v. *United States,* 107 U. S. 445; *United States* v. *Guaranty Trust Co.,* 280 U. S. 478; *cf. Callahan* v. *United States,* 285 U. S. 515. See also dissent in *United States* v. *Emory,* 314 U. S. 423 at 433. The problem here is not whether a mere state claim can defeat one of the Federal Government, but whether one federal statute will be so construed as to defeat the manifest policy of another.

The Court's opinion, however, goes to some lengths to show that the Court as a whole and without dissent on this point has become committed to the interpretation it adopts, and by unusual deference to the doctrine of *stare decisis* declares itself bound hand and foot to full federal priority. I am unable to detect the commitment which the Court so clearly sees. But if I have agreed to any prior decision which forecloses what now seems to be a sensible construction of this Act, I must frankly admit that I was unaware of it. However, no rights have vested and no prejudicial action has been taken in reliance upon such a ruling. It does not appear to have been called to the attention of Congress and in effect approved by failure to act. Under these circumstances, except for any personal humiliation involved in admitting that I do not always understand the opinions of this Court, I see no

reason why I should be consciously wrong today because I was unconsciously wrong yesterday.

I would reverse the judgment and allow federal priority only subject to the 90% credit for sums disbursed to the State on account of its unemployment compensation tax.