**SINCLAIR OIL & GAS COMPANY,**
Appellant,

v.

**R. B. MASTERSON et al., Appellees.**

No. 17530.

United States Court of Appeals
Fifth Circuit.

Oct. 27, 1959.

Rehearing Denied Dec. 21, 1959.

Paul A. McDermott, G. B. Mallum, Fort Worth, Tex., Nathaniel J. Harben, New York City, for appellant.

D. H. Culton, Amarillo, Tex., Culton, Morgan, Britain & White, Amarillo, Tex., of counsel, for appellees.

Before RIVES, Chief Judge, and CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

Sitting without a jury, the court below entered a judgment in favor of plaintiffs Masterson, appellees here, and against defendant Sinclair Oil & Gas Company, appellant here, requiring Sinclair to drill within the ensuing five years thirty exploratory wells prospecting for oil, providing alternatively for the surrender of lease acreage or payment of money penalties. The Mastersons own ninety thousand acres [1] of land in Moore and Potter Counties, Texas, and had, between the years 1916 and 1938, executed thirty-one separate oil and gas leases. By mesne assignments these leases, insofar as they covered oil, had come into the ownership of Sinclair, and the gas rights had become the property of Colorado Interstate Gas Company.[2] Colorado, or its predecessors in title, had adequately explored and developed the leases as applied to gas by drilling 114 wells, and had by contract with the Mastersons been released from further obligation to drill for gas.

From the decree entered against it Sinclair appeals, specifying sixteen errors which it relies upon for reversal and which it reduces to eight principal issues. In summary, its main contentions for reversal are these:

That Sinclair was under no implied covenant to "explore" the Masterson lands for oil (as differentiated from the implied covenant to develop), because Colorado and its predecessors had extinguished the obligation to explore by drilling the 114 wells, this contention being based upon the claim that such covenants were not divisible as between the owner of gas rights and the owner of oil rights, and that Sinclair was entitled to credit for all of the exploration conducted by Colorado and its predecessors; that Colorado's explorations and the wells drilled by Sinclair after the filing of this civil action had satisfied Sinclair's duty to explore, it being contended that under Texas law, there was no implied duty to explore after the Masterson leases had been proven by these gas and oil wells; that the sole obligation then resting upon Sinclair was to "develop," which obligation did not arise without proof on the part of the Mastersons that the drilling of exploratory wells would probably result in a profit to Sinclair; that the decree of the court below is arbitrary and is unsupported by any evidence which would justify the exploration or the alternative penalties required by the judgment; that as to three of the leases,

---

1. The correct number is 89,282.86 acres, but we will follow the lead of the litigants and refer to the acreage in round numbers.

2. The court had, of its own motion, brought Colorado in as a defendant, but it was eliminated from the case by the final judgment and is not a party to this appeal.

the presence of express covenants negated the existence of any implied covenants; that as to one lease, a prior suit brought by the Mastersons was res judicata of the present action; and that the judgment of the court below was too ambiguous, uncertain and indefinite to furnish an enforceable guide or standard of what Sinclair was required to do.

The validity of these several points must be tested under the legal principles for which Sinclair contends as applied to the facts as found by the trial court. These facts will be brought into as narrow compass as their complexity will permit.

This civil action was brought June 16, 1955 "to enforce the implied covenant or covenants, alleged to exist in and as a part of each of such leases, for adequate exploration and development of the lands covered by such leases insofar as oil is concerned." The ninety thousand acres of the Masterson ranch were covered by thirty-one leases given to various individuals largely during the period 1916 to 1924 and all prior to 1940. Each of the leases was executed for a small bonus consideration averaging less than $1.00 per acre; the primary terms were short, running from one to four years in most instances. Each lease contained a provision requiring the payment of royalties measured by the quantities of oil produced and a provision requiring the payment of royalty measured by the volumes of gas produced.

By writings executed mostly in 1928 and all prior to 1940, the oil rights and the gas rights under the leases were partitioned, and have, during the intervening period, been held by different producers. This partition was accomplished by conveyances between the different lessees and their assigns, except as to one set of leases covering 1,260.67 acres in which the Mastersons partitioned the oil and gas by separate leases to those owning the respective rights in the other lands. In 1928, the owners of the oil rights and the owners of the gas rights entered into an operating agreement containing, as one of its terms, an option to the owner of the respective oil and gas rights to take over, under the provisions of the agreement, any well which either might sink which encountered the mineral owned by the other.

Prior to the filing of this action, 114 wells had been drilled on the Masterson lands by the owner of the gas rights and for the production of gas only, eleven of which were dry holes. A few of these gas wells had been drilled to a depth sufficient to test the oil horizon, and some of the drilled wells had revealed oil "shows." If oil exists at any point on the Masterson lands, "the better prospect will be to find it at horizons below those from which the gas lessee had been producing gas, and it was not the practice of the gas lessee to drill its well a sufficient depth to test such oil zone." The zone at which oil, if any, may be expected to be found in most of the area is from approximately 200 feet above to approximately 100 feet below sea level. Of the 114 wells producing gas from the Masterson lands, only two have been drilled to sea level, and only five have been drilled into the horizon from 200 feet to sea level, two of which encountered oil shows.

The owner of gas rights had fully explored and developed the leased premises for gas, but after the separation of oil and gas rights and prior to the institution of this action, no owner of the oil rights had drilled a well on the Masterson land. Commencing in June, 1954, plaintiffs commenced negotiation with Sinclair seeking development by it of the oil rights conveyed in the leases. These negotiations terminated when, May 19, 1955, Sinclair stated that "it had reviewed all facts available with regard to development on the lands, had studied geological opinion on those facts, and had reached the conclusion that there had been no default by it in the conduct of exploratory operations on the Masterson lands." This letter precipitated the filing of this action. The complaint does not challenge that the leases are in full force and effect as to both oil and gas, but seeks "an enforcement of the leases

by a determination that defendant has violated the implied covenants of the leases requiring the exercise of reasonable diligence in prospecting and developing for oil the leases on plaintiffs' lands, and that defendant be required to proceed with operations under such a program and within such a time as the Court shall find equitable."

Sinclair commenced its first drilling of a well on plaintiffs' lands about three months after this action was begun, choosing to drill at a point where Colorado had encountered oil in deepening one of its gas wells. This Sinclair well was completed as an oil producer Nov. 25, 1955. Prior to the first hearing of this action in June, 1957, Sinclair commenced the drilling of seven other wells, of which five were completed as producers of oil and two as non-producers. All of these wells were in the section in which the discovery well was located except one, which was in the section immediately to the east. All of the wells were in the northwest corner of the Masterson land except one, which was located about ten miles east of the others and near the northeast corner of plaintiffs' land. Over a period of two years from the filing of the suit and three years from the time of plaintiffs' demand, defendant had drilled upon the Masterson 90,000 acres only eight wells, six of which were producers and seven of which were in a limited area.

At the first hearing in June, 1957, a subordinate official of Sinclair predicted considerable activity and drilling by defendant in the immediate future, which included also seismograph explorations on the entire Masterson tract aimed at determining the best places to drill. He predicted that the seismograph work would be completed by the middle of August and that this would reveal what oil deposits probably underlay these lands.

After studying briefs furnished by the parties, the court below addressed a letter to them expressing the opinion that the defendant had been guilty of unreasonable delay in performing the implied covenant to explore for oil, manifesting no interest in oil exploration on these lands for a very long period of time. It expressed the opinion also that the wells which had been drilled for gas were inadequate to test for oil. The court stated that it found the testimony of the likelihood of finding oil under the vast reaches of the Masterson lands in conflict, and that it felt that it ought to await the seismograph survey and the further actions of Sinclair towards performance of the lease provisions before completing the hearing.

When the hearing was resumed about a year later, the court discovered that only three additional wells had been drilled, mostly in the general neighborhood of the discovery well, two of which were good producers, and that arrangements had been made for drilling four more wells, one of which was completed in June, 1958 as a prolific producer. At the reopened hearing, the court found that the wells drilled in the intervening period were still inadequate, that the seismograph work had not been prosecuted as promised, that no top policy man testified that adequate development was in authoritative prospect.

The court found that "The evidence shows that it is fairly probable that some of the undeveloped areas of the leased land will be found to be productive of oil, but the number and extent of such areas can be determined only by drilling;" that Sinclair had been neglectful of the rights of plaintiffs, that development both before and after the filing of this action had been inadequate, that the zone where oil would be most likely to be found had not been penetrated by the gas wells, and that particularly in view of the enormous acreage involved and of the unusually long delay in drilling, the plaintiffs were entitled to the relief they sought.

The judgment entered was based upon its conclusions of law that each of the leases required the exercise of reasonable diligence on the part of the oil lessee adequately to explore and adequately to develop the leased premises, and that

the duties resting upon the oil lessee and those upon the gas lessee were separate and distinct with respect to such exploration and development; that the separation of the oil rights and obligations from those pertaining to gas was legal, and that the obligations resting upon Sinclair were independent of those resting upon Colorado; that it was not equitable that Sinclair be required to explore each lease separately, as normally it would be obliged to do, but that the entire 90,000 acres should be considered as if under one lease for the purposes of minimum requirements of drilling for oil; and that "Under the facts of this case, no burden rests on plaintiff to show that the drilling of any or all such exploratory wells would result in profit to the defendant."

Based upon its findings and conclusions, the court, as stated, ordered Sinclair to drill six exploratory wells annually for five years so spaced as to reflect a good faith effort to make a fair search in different areas for oil production, to be drilled to the horizons the court had found to be those where oil would be found if any should be present. Failure of defendant to show its good faith by completing the wells required in the first year would result in cancellation of the leases except as to the sections or surveys wherein producing and paying oil wells were located. After the first year, defendant could be excused from drilling any well by surrendering three thousand acres of its own choosing or paying $50,000.00, shown by the proof to be about the cost of drilling a well. The surrender of acreage in the second and third years is increased to five thousand, to be selected by plaintiffs if defendant fails to comply with the terms of the judgment. The judgment left untouched the obligation of Sinclair to develop proven portions of the tract, and plaintiffs' action was dismissed as far as it related to any obligation on Sinclair's part to drill to formations below those described therein.

Sinclair first attacks the judgment entered by the court below and its findings and conclusions on the ground that they are in conflict with a decision rendered by the Supreme Court of Texas since this case was tried in the court below and since it was argued before us, it being discussed in supplemental briefs by both parties.[3] Its contention is based chiefly upon the claim that the Mastersons were not entitled to any of the relief they sought, because under the Clifton case it should be held as a matter of law that the evidence before the court below was insufficient to support its findings and conclusions in that plaintiffs failed to sustain the burden of proving that further exploration or development would result in a profit to the lessee. The importance attached to this decision by appellant warrants a close examination of what was held and the factual basis of the holding.

Mrs. Clifton sued to cancel an oil, gas and mineral lease upon approximately 350 acres [4] upon which one well had been drilled which produced gas and a small amount of oil and which was classified under the rules and regulations of the Texas Railroad Commission as an "associated" gas well. In the course of the years the leasehold estate had been broken up into fractional interests and Koontz acquired a considerable portion thereof. He procured the classification of the well to be changed so as to increase the amount of the "allowable" production and began, about Sept. 12, 1956, reworking the well with such success that within a few weeks, the production of gas from the well had been increased about eighteen hundred times.

In August, 1956, Mrs. Clifton had sued Koontz and several other fractional lease-

3. Clifton v. Koontz, Tex.1959, 325 S.W.2d 684, affirming the decision of the Court of Civil Appeals of Texas, Fort Worth Division, 1957, 305 S.W.2d 782.

4. The Texas Court of Civil Appeals re- ferred to the acreage thus: "The size of the lease is approximately equal to the basic size used by the Railroad Commission in computing the size of a reservoir." [305 S.W.2d 784.]

holders seeking cancellation of the lease, based chiefly upon the assertion that a Mr. Kadane had drilled a well on adjoining acreage and had obtained a good oil showing, and had contracted with Mrs. Clifton that, if she could succeed in cancelling the lease to Koontz and others in whole or in part, he would take over that released and drill a well for oil. Kadane's well was producing from the same formation and the same depth as Mrs. Clifton's well, the formation being known as the Atoka Conglomerate found at a depth from 5,300 to 5,600 feet. Under Texas Railroad Commission Regulations the drilling of a second gas well into the same horizon would not affect the allowable withdrawal and might result in actual harm to the lessor.

The basis of the suit was the charge that production in paying quantities from the existing well had ceased, and that Koontz et al. had breached the implied covenants "to reasonably develop the existing minerals and/or to reasonably explore for new sources of production." Damages for non-development were also sought, but the trial court held that they were incapable of being established with sufficient certainty to form the basis for a judgment. The trial court further found that the production of gas in paying quantities had not ceased and denied cancellation based on that premise.

The trial court found, however, that Koontz et al. had breached the implied covenants "to reasonably develop and reasonably explore the lease for oil and/or gas," and conditionally granted forfeiture of the leasehold estate "except for the stratigraphic interval between 5,300 to 5,600 feet." With that exception the lease was ordered cancelled unless within sixty days the lessee drilled a new well to a depth of 5,600 feet.

The Court of Civil Appeals reversed this action of the trial court and proceeded to consider cross-assignments of error filed by Koontz et al. in connection with which it held that the case should be considered as one involving exploration rather than development. It found that there was no evidence in the record

of any geological formation or horizon in the area other than the Conglomerate, and that the record was lacking in evidence that a reasonably prudent operator would drill in the area and make search for oil in any other horizon, finding also that Mrs. Clifton impliedly admitted this to be true. It further found that Kadane would not be bound by the mentioned contract, because Koontz' lease was cancelled only as to horizons outside the Conglomerate, it being emphasized that there was no proof of any other known formation in the area from which any production might reasonably be expected.

Considering the case from the standpoint of *development* the Appeals Court felt that, in the light of hindsight, it had been demonstrated that the existing well ought to have been reworked at an earlier date, but held that damages for the delay were not sufficiently proven. The court quoted with approval from an article by C. J. Meyers in 34 T.L.R. pp. 553, 581, in which it was stated: "The covenant of further exploration need not become a lease-breaking device and will not become one *if the courts exercise control over it.*" [Emphasis supplied.]

The Court of Appeals, declaring that "The trial court was clothed with great latitude of discretion in deciding whether the existing well on the lease had or had not 'ceased' to produce" oil and gas in paying quantities, held that the trial court's finding was supported by the evidence and concluded that, under the production limitations fixed by the Texas Railroad Commission, there was no showing of a breach of covenant on the part of the lessee.

Upon Mrs. Clifton's appeal to the Supreme Court of Texas, that court first considered whether there was "any evidence to sustain the finding of the trial court that production in paying quantities had not ceased." A good part of the opinion is taken up with a discussion of the meaning of the requirement for production in paying quantities and, after a detailed consideration, the Supreme Court found that the trial court was supported in its finding that there was such

production. The opinion then deals at length with the question of whether the one well represented reasonable development of the lease and concludes that, in view of the regulations of the Railroad Commission as applied to the facts of that case, there was no violation of the implied covenant for reasonable development.[5]

The Supreme Court then treated briefly the question of further exploration, repudiating a decision of the Texas Court of Civil Appeals in Willingham v. Bryson, 1956, 294 S.W.2d 421. It approved the finding of the trial court that under the facts and the terms of the lease, there was no duty to conduct further exploration. In approving that finding the Supreme Court used quite general language, which Sinclair seizes upon as establishing the general rule of law it conceives to be controlling in the case before us, that a lessee is released from the duty of further exploration of a lease after production has been established on lands included in it.

This general language is, of course, limited to the facts before the court.[6] The Supreme Court of Texas was conscious of this rule of law and stated it in clear terms (325 S.W.2d 696):

"However, it should be noted that we do not have a factual situation where the lease covers several thousand acres and an effort is being made to hold such vast acreage by showing production from a comparatively small area. Neither are we confronted with a situation where an unreasonably long length of time has elapsed since the last development of the leased premises. Therefore, we do not pass upon these questions."

These words of caution could not have furnished a surer guide for interpretation of its language if they had been used with the case now before us in mind.

That the Supreme Court of Texas was not, in Clifton v. Koontz, announcing any radical departure from long established principles of law is made further obvious by its citation of the landmark cases of Brewster v. Lanyon, 8 Cir., 1905, 140 F. 801, and Sauder v. Mid-Continent Petroleum Corp., 1934, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255, reversing the decision of the same case by the Circuit Court of Appeals for the Tenth Circuit, 1933, 67 F.2d 9. These two decisions have been cited so generally that they are looked upon by many writers as the main foundation of modern oil and gas law establishing the duties of a lessee in an oil and gas lease and they deserve

---

**5.** The ruling is epitomized in this statement from 325 S.W.2d 695: "The field rules prescribed by the Railroad Commission * * * provide for 320-acre units with 10 per cent tolerance so that a maximum of 352 acres may be assigned. Consequently, on this particular 350-acre tract, only one well could be permitted to be drilled to the Morris sand. * * * Thus, it is seen that if a second well had been drilled on the 350-acre lease to the Morris sand, then the total allowable for the two wells would have been no greater than the allowable for one.

"We conclude from all of the above circumstances that the respondents did not violate the implied covenant to reasonably develop the lease by the drilling of additional wells. * * * *"

**6.** The Court of Civil Appeals of Texas, 1954, in Mitchell v. Town of Refugio,

265 S.W.2d 261, 267, referred, in stating this general rule, to 14 Am.Jur., p. 291, Courts, § 79. The opening words of that section are these: "The language and general expressions in an opinion of the court are to be taken in connection with the case—that is, the facts and issues involved in the particular record under investigation in which those expressions are used. * * * *"

The Supreme Court of the United States referred to the rule thus in Armour & Co. v. Wantock, 1944, 323 U.S. 126, 132–133, 65 S.Ct. 165, 168, 89 L.Ed. 118: "It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion." And see also Massachusetts v. United States, 1947, 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968, and Freeman v. Hewit, 1946, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265.

treatment at some length because of that fact.

Brewster v. Lanyon, written by Judge Van Devanter not long before he became a member of the Supreme Court, delved deep into the general nature of this lessor-lessee relationship, and some of the general principles enunciated in the decision are quoted in the margin.[7] These disconnected excerpts from the Brewster opinion are set forth only as accurate and universally accepted declarations of the nature and general incidents and concomitants of an oil and gas lease as applied by the Supreme Court and the courts of the oil states.

The decision of the Supreme Court in Mid-Continent Petroleum Co. v. Sauder, supra, cited as aforesaid by the Texas Supreme Court in the Clifton case, bears such a close resemblance to the one before us now that a careful look at its facts and its holdings is indicated. A district court in Kansas had decreed cancellation of an oil and gas lease upon a half section of lands, saving to the lessee only the forty acres adjoining it on

---

7. "Although the parties with sanction of a general practice, denominated the instrument a 'lease,' strictly speaking it was not such, but was more in the nature of a grant in praesenti of all of the oil and gas in the lands described—these minerals being part of the realty—with the right to enter and search for them, and to mine and remove them when found. * * * [140 F. at page 807] 807.]

"Looking, then, to the present lease, it is seen that the real subject thereof was the oil and gas believed to be in or obtainable through the lessor's land, and the right to search for them and to reduce them to possession. * * * [p. 809] The implication necessarily arising from these provisions—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor. That this was of the very essence of the contract is shown by the extensive character of the grant, which was without limit as to time and included all the oil and gas in or obtainable through the demised premises; by the provisions for the payment of substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which, as contrasted with the consideration paid when the lease was executed, shows that the promise of these royalties was the controlling inducement to the grant * * * Considering the migratory nature of oil and gas, and the danger of their being drawn off through wells on other lands if the field should become fully developed, all of which must have been in the minds of the parties, it is manifest that the terms of the lease contemplated action and diligence on the part of the lessee. * * * The subject was, therefore, rationally left to the implication, necessarily arising in the absence of express stipulation, that the further prosecution of the work should be along such lines as would be reasonably calculated to effectuate the controlling intention of the parties as manifested in the lease, which was to make the extraction of oil and gas from the premises of mutual advantage and profit. * * * [P. 810.]

"* * * These provisions make it plain that it was the intention of the parties to make the covenants of the lessee conditions as well as covenants, and to reserve to the lessor the right to avoid the lease for the breach of any of them. * * *

"The conclusion is that compliance with the covenant to continue with reasonable diligence the work of exploration, development, and production after the expiration of the five-year period, if during that time oil and gas, one or both, be found in paying quantities, is by the terms employed made a condition the breach of which entitles the lessor to avoid the lease. * * * [PP. 812–813.] By reason of the conditions on which the lease is granted the lessor retains at least a contingent interest in the oil and gas, to the profitable extraction of which the operations are directed. * * * The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. * * *" [P. 814.]

which two small producing wells had been drilled. By divided court, the Circuit Court of Appeals of the Tenth Circuit reversed on the ground of the overwhelming showing of geological information that oil would probably not be found under this 320 acres.[8] The Supreme Court granted certiorari and, as shown by the briefs 292 U.S. 273, 54 S.Ct. 671, Mid-Continent's contention was that under Brewster v. Lanyon and other cases, "its lease does not impose upon it any implied obligation to drill an additional well upon the leased premises, in the absence of an affirmative showing that, under all the circumstances, there was a reasonable probability that oil or gas, in paying quantities, would have been discovered, or that a reasonably prudent operator would have drilled. * * * The burden was upon the petitioners to plead and prove that some of these conditions existed."

Responding to that contention, the Supreme Court, by unanimous decision of the participating Justices, including the author of Brewster v. Lanyon, supra, commented on the fact that the two wells which had been drilled were offset wells, that seventeen years had expired since their drilling, that the district court, while finding that probably some damage was being done to the leasehold by wells on adjoining property, was unable to decide the question of the likelihood that additional wells would pro-

duce oil or gas in paying quantities, which nothing but exploration by drilling could settle, and held that Mid-Continent had not in good faith and with reasonable diligence explored and developed the lands as required by the implied covenants of the lease. Adverting to the fact that the Circuit Court of Appeals had announced that "The question for decision is whether the respondent failed to comply with an implied covenant to develop the tract with reasonable diligence," the Supreme Court concluded that "the rule followed generally requires a reversal of the decree dismissing the bill." [292 U.S. 272, 54 S.Ct. 672, 673.] Here is some of its language which has been almost universally accepted and has been cited and quoted in numberless cases:

"It is conceded that a covenant on respondent's part to continue the work of exploration, development and production is to be implied from the relation of the parties and the object of the lease * * * The petitioners say that, if the lessee with good reason believes there is no mineral to be obtained by further drilling it should give up the lease; the respondent insists that, as there is only a possibility of finding mineral, no prudent operator would presently develop, but the mere possibility entitles it to hold the lease, because it is producing oil from a portion of

---

**8.** Judge McDermott wrote a vigorous and well documented dissent, which is worthy of close study because his reasoning was adopted by the Supreme Court in preference to that of the majority. Some of the dissenting Judge's graphic language is worth repeating (67 F.2d 16):

"If the phrase 'having regard for the interests of the lessor' has any real meaning, I think the defendant ought not to hold 320 acres, almost surrounded by oil wells, without even one test well. The defendant, in common fairness, ought to give these lessors a well or get off and let someone else drill it. * * *

"The truth is that this half section is neither proven nor condemned. No one will ever know whether there is oil under this land until a drill goes down.

Mr. Moody [the lessee] says that; his geologists say it; their anxiety to keep it corroborates their statements. Mr. Moody wants some other company to drill on adjoining acreage; in other words, he wants to retain his gamble at the expense of his lessors and adjoining operators * * *

"* * * But Mr. Moody * * * knows too much to release this lease because of geologic guess. Their science is valuable to condemn the lease in court in justification of a failure diligently to develop; but he will not back their testimony by relinquishing the lease. * * *

"* * * I think a decree should enter that the lease as to the 320 acres be cancelled unless, within a reasonable time, an exploratory well is drilled to the Mississippi lime."

the area. We think the respondent's contention cannot be sustained. * * *" [292 U.S. at page 279, 54 S.Ct. at page 673.]

The court thereupon quoted with approval three paragraphs from Brewster v. Lanyon and added:

"This definition of the scope of the implied covenant has been generally adopted in decisions of federal and state courts [citing many cases including one from Texas, Texas Co. v. Ramsower, Tex.Com.App., 7 S.W. 2d 872]. The facts demonstrate that the respondent has not complied with its obligations. It has held a half section for seventeen years without the drilling of an exploratory well, and claims to be entitled to hold the lease for an indefinite period with no exploration unless some other operator brings in a producing well on adjoining lands, or fresh geological data come to light. The two producing wells are on the 40 acres comprising the smaller of the adjacent areas embraced in the lease. The justification for the respondent's position is that the geologic data and the experience upon surrounding lands are both unfavorable to the discovery of oil or gas upon the east half of section 16 (the 320 acre tract). The respondent's officers state that they desire to hold this tract because it may contain oil; but they assert that they have no present intention of drilling at any time in the near or remote future. This attitude does not comport with the obligation to prosecute development with due regard to the interests of the lessor. The production of oil on a small portion of the leased tract cannot justify the lessee's holding the balance indefinitely and depriving the lessor, not only of the expected royalty from production pursuant to the lease, but of the privilege of making some other arrangement for availing himself of the mineral content of the land.

"The decisions on which the Circuit Court of Appeals relied recognize and apply the rule of Brewster v. Lanyon Zinc Co. supra, but are distinguishable because of a difference in the circumstances in which the rule was applied. * * * In none of them was there a neglect to explore or develop for any such period as is here shown, or an expressed intention not to do so, in a comparable situation." [292 U.S. at pages 280–281, 54 S.Ct. at page 673.]

The court thereupon announced that the decree suggested by dissenting Judge McDermott, canceling the lease as to the three hundred twenty acre tract unless within a reasonable time an exploratory well should be drilled, would recognize and protect the equities of both parties.

■ The principles announced in the Brewster and Sauder cases have been applied uniformly by the Courts of Texas, e. g., W. T. Waggoner Estate v. Sigler Oil Co., 1929, 118 Tex. 509, 19 S.W.2d 27; Lido Oil Co. v. W. T. Waggoner, Tex.Civ.App.1930, 31 S.W.2d 154; and Perkins v. Mitchell, 1954, 153 Tex. 368, 268 S.W.2d 907; and by this Court, Cosden Oil Co. v. Scarborough, 5 Cir., 1932, 55 F.2d 634; Cowden v. Texas Development Co., 5 Cir., 1937, 89 F.2d 947; Amerada Petroleum Co. v. Doering, 5 Cir., 1937, 93 F.2d 540, 114 A.L.R. 1385; Hull v. Magnolia Petroleum Co., 5 Cir., 1941, 119 F.2d 123; Humble Oil & Refining Co. v. Romero, 5 Cir., 1952, 194 F.2d 383, and cases discussed infra; and by the Courts of Oklahoma and other states in which oil and gas are produced. We do not find any authorities cited by Sinclair, or its efforts to explain the foregoing decisions of this Court, or the Brewster and Sauder cases convincing or as justifying the basic conclusion which it seeks to establish: that exploration in any part of a lease, particularly where production ensues, nullifies the obligation to explore other parts of the lease. The Clifton case is a good example of the error in appellant's conception of the covenants for exploration and development. All that the Supreme Court of Texas did there was to affirm the findings of the trial court against the contention that the undeveloped 320 acres

would probably produce oil, and that no profit to lessor or lessee would accompany the bringing in of other gas wells under the regulations of the Texas Railroad Commission.

None of the cases presented or discussed by Sinclair stand for the principle that under all circumstances exploration, accompanied or unaccompanied by production, of a portion of a lease, satisfies completely the implied covenants of exploration-development.

This Court said more than two decades ago:[9] "Necessarily each case depends for decision upon its own peculiar facts," and we have said the same thing in several more cases.[10] We are of the opinion, therefore, that the facts of this case clearly distinguish it from the holding of the Texas Supreme Court in the Clifton case, and bring it clearly within the ambit of Sauder v. Mid-Continent. Of course, the facts in the case before us are much stronger in favor of the lessors in their insistence upon further exploration and development than were those in any of the cases cited or relied upon by either party.

■ We might add that even under the reversed decision of the Tenth Circuit in Sauder, there was sufficient evidence to sustain the finding of the lower court of the probability of oil discovery on *other* portions of the Masterson lands.[11]

The showing made by plaintiffs here was more than slight. Aside from the strong probative force of the oil shows encountered by Colorado and the producing wells drilled by Sinclair, the opinion evidence of plaintiffs' geologist Hughes was sufficient to support a finding of the reasonable probability of oil production on portions of the Masterson land. In the swearing match between him and Sinclair's expert Hornaday, Hughes had a little the better of the dispute by reason of his longer intimate acquaintance with the Panhandle territory. Hughes was of the opinion that the "submerged" mountain ranges underlying the Masterson land were in peaks and valleys, while Hornaday felt that there was only sloping table land. The trial judge was evidently more inclined to follow Hughes, and a reading of the testimony of both fails to convince us that he was wrong. This testimony supported by the producing wells on portions of the Masterson land, considered against the background of Sinclair's failure to use its own geologists as witnesses and to complete its seismographic tests, was sufficient to warrant a finding by the court below that exploration or development of portions of the Masterson land would probably prove profitable to the lessee as well as the lessor.

■ We think that Sinclair's argument that it is entitled to credit on its implied covenants of exploration and development for all of the wells drilled by Colorado and its predecessors, is without merit. This is so as a matter of fact, because only a negligible percentage of wells drilled by the owner of the gas rights penetrated the horizon where the proof shows oil would be expected and where it has actually been found. The operator of the gas rights, from the standpoint of what actually happened and of logic, was diligent to avoid getting into any liquids whether oil or water, because of the difficulties in walling them off so as to prevent interference with the production of gas.

9. Cowden v. Texas Development Co., 5 Cir., 1937, 89 F.2d 947, 949.

10. Amerada Petroleum Co. v. Doering, 5 Cir., 1937, 93 F.2d 540, 541, 114 A.L.R. 1385; Hull v. Magnolia Petroleum Co., 5 Cir., 1941, 119 F.2d 123; Humble Oil & Refining Co. v. Romero, 5 Cir., 1952, 194 F.2d 383.

11. The majority there said (67 F.2d 12): "In view of the long lapse of time since any development has taken place on the lease, the large area undeveloped, and the fact that the lessor is precluded from exploring it himself or through a third person, *slight indication* that the undeveloped portion contains oil or gas in paying quantities, regard for the interests of the lessee as well as the lessor, would require further development." [Emphasis supplied.]

We think that the position is untenable also as a matter of law. Sinclair relies on our case of Southern Minerals Corporation v. Simmons, 5 Cir., 1940, 111 F.2d 333, as its authority. That case does not, in our opinion, stand for Sinclair's argument at all. The landowner there was in no way involved in the litigation. The contest was between the original lessee, holder of the oil rights, and its transferee, owner of the gas rights, under an agreement which provided that if either should bring in the other's product, he would not have to plug the well and lose his drilling costs, but would be permitted to complete the well, granting to the other the option to pay the costs and take it over. No question was there presented as to whether exploration under the gas lease inured to the benefit of the owner of the oil rights. The holding was that the working agreement between the owner of the oil rights and the owner of the gas rights was part and parcel of the separation of the two categories of rights, and was to be and remain mutual so that subsequent assignees might avail themselves of its benefits. The obligations to the lessor of the separate owners of oil and gas rights were not discussed.

■ Nor do we think that the arrangements between Sinclair and its predecessors on the one side and Colorado and its predecessors on the other have any effect on the claims of the Mastersons here. They are entirely *res inter alios acta*. Moreover, the lessors were not in any way involved in or affected by the agreements between these lessees.

We think also that this contention of Sinclair is ruled against it by our recent case of Mattison v. Trotti, 5 Cir., 1959, 262 F.2d 339, 341. This case involved Texas oil interests, the decision was written by a Texas Judge of long experience and great learning, and the holding, amply supported by the cited authorities, was that the well drilled by a lessee owning an undivided leasehold interest in land did not suffice to satisfy the obligation of the owner of another such interest so as to rescue a non-drilling leaseholder from forfeiture of his rights.

We stated there that any other holding would be contrary "to the uniform holding of the Texas decisions that in an oil and gas lease, where there is no cash consideration paid, the drilling for and the production of oil or gas by the lessee is the prime consideration, and if not so stated in the lease will be read into it." We made it clear that responsibility in such matters is single. We were there construing the clause universally found in leases that they shall remain in force "as long * * * as oil or gas or either of them is produced from said land." In that case, the quoted words were not followed by the phrase "by the lessee," while that phrase does appear in all of the leases before us except one. This contention is, therefore, clearly disposed of by the language of the leases themselves and the holding of the case discussed.

■ As to three of the leases embracing nearly half of the lands involved in this action, Sinclair takes the position that the inclusion of express covenants to drill for oil or gas within a specified time has the effect of excluding any implied covenants for exploration, development and production. The first of the leases to which this argument is directed is one dated May 10, 1923 covering 29,455.11 acres executed to Producers and Refiners Corporation at a consideration of $1.00 per acre. The lease carries a ten year primary term and provides for a rental of $1.00 per acre for that period.

The lease requires the lessee to begin exploration within six months and to follow it with a second well within ninety days thereafter. The lands covered by this lease embrace most of those in the northeast and northwest corners of the Masterson land, as well as another large body of land near the southwest corner and other separated parcels in other portions. Shortly prior to the expiration of the primary term, the then owners of the lease, Canadian River Gas Company, owner of the gas rights, and Parcomis Oil and Gas Company, owner of the oil rights, agreed to continue the payment of the $1.00 per acre annual rentals to

lessor until and unless royalty payments under the lease should exceed the rental payments due.

The second of the leases embraced in this contention, executed May 7, 1926, also contained a special obligation to drill two wells to a certain depth within a specified time; and the third such lease, dated June 1, 1926, likewise expressly required two wells to be drilled to a certain depth within a specified time. All of the wells covered by these special agreements were drilled within the requisite time limits.

Sinclair contends, therefore, that each of these three leases covering respectively 29,455.11 acres, 5,712.85 acres, and 5,247.2 acres, demonstrates that the parties had the intent of declaring that two wells seeking oil on each of the leases would constitute reasonably adequate exploration and development. The authority upon which it chiefly relies to sustain this contention is the case of Gulf Production Co. v. Kishi, Tex.Com.App. 1937, adopted by the Supreme Court of Texas, 129 Tex. 487, 103 S.W.2d 965.

Examination of that case reveals that it involves two leases, the first covering 150 acres with a recited consideration of $2,000.00, providing for the drilling of twelve wells in rapid succession with forfeiture attending failure so to drill, and with the provision that only five acres should be saved to the lessee around each producing well. The second lease covered twenty acres and was given for a bonus of $100 per acre and like provisions were inserted for the rapid completion of wells within a short time limit under pain of forfeiture.

The case quotes the general rule as to implied covenants from Merrill, Oil and Gas Leases, p. 968: "The implied covenant for further development is based by the courts upon the same foundation as that for exploration, namely that the inducement for the making of the lease is the lessor's desire to have his land promptly explored and thoroughly and diligently developed, and that, therefore, where the lease is silent upon the subject it is impliedly agreed that the lessee shall be diligent in developing the premises if oil and gas is discovered in paying quantities."

The Commission found under the facts above outlined that fifteen wells on one tract and six on the other constituted reasonable development and showed a clear intent of the parties to the leases that the drilling of the specified number of wells would constitute performance of the entire obligation of reasonable development. It is difficult to perceive how any reasonable person could have concluded otherwise than that twenty-one wells on 170 acres was indicative of an extreme measure of diligence.

That case and the other authorities relied upon do not, in our opinion, furnish authority in respect to the three leases before us. It would put a hard strain upon one's sense of proportion to assume that a landowner would be content with six wells on a little less than forty thousand acres. A reading of the three leases involved here convinces us that the parties had no such intention, but were merely speeding up the implied covenant of the lessees for reasonably diligent exploration and development by setting a deadline for at least two wells under each lease. Reverting again to the Producers and Refiners' lease, an examination of the map shows that this lease covers seventy-five tracts of land ranging from about eight acres to more than seven hundred acres, and that many of those tracts are as far apart as twenty miles. To assume that the parties intended that two wells on such a lease would constitute full performance by the lessee would be to give ear to the absurd. This contention is wholly devoid of merit and we do not find it supported either by reason, by the terms of the leases, or by any of the authorities upon which reliance is placed.

The next specification of error argued by Sinclair is that, as to the 18,-500 acres embraced in a lease given by the Mastersons in 1916 to one Nobles, plaintiffs are estopped by a judgment rendered against them in a suit in the District Court of Potter County, Texas

styled Masterson v. Amarillo Oil Co., which judgment was affirmed by the Court of Civil Appeals in 253 S.W. 908 (1923, writ dismissed). The present action was begun more than thirty years after that one was concluded. A lessee's obligation under an oil and gas lease is continuing and ambulatory.

█ The judgment rendered in the former suit cannot be construed as *res judicata* of the present action under general principles of law, and particularly since, in the former suit (253 S.W. 915–916), the appellate court specifically approved the limitation placed upon the judgment by the trial court that it should apply only to forfeiture and cancellation and should "not be a bar to any future action for damages or specific performance." The judgment now before us does not compel Sinclair to drill on the land covered by the Nobles lease, but gives it the right so to do. The reservation in the former decree leaves the court below full discretion to award damages or specific performance if the facts then presented should warrant. That is all the Mastersons are seeking, and the former judgment stands as no impediment to the rendition by the court below of any judgment for damages or specific performance and the authorities cited by appellant do not, in our opinion, support its contention.

█ A further contention of Sinclair is that the fifteen wells drilled by it since this action was begun make it moot, absolving Sinclair from further obligation to explore or develop. No authorities are cited and reliance for justification of Sinclair's position is based largely on the testimony of its subordinate official Lowrance and its independent geologist Hornaday. The court below was not persuaded by these arguments; nor are we.

When this action was begun in June, 1955, no drilling had been done by Sinclair or its predecessors, owners of the oil rights, for more than twenty-five years. The court below had the power to adjudicate the rights of the parties as of the time the action was begun; but in the exercise of its equitable discretion it did not do so, but considered and gave weight to defendant's actions in the ensuing years. Prior to the filing of the action plaintiffs had endeavored to induce Sinclair to begin drilling activities, but it replied in writing that it was under no obligation to do so.

The fifteen wells drilled or "staked" for drilling in approximately two years are confined to two of the thirty-one leases. If that rate should be pursued, exploration and development would not be completed on the entire tract based upon Texas spacing laws under several centuries. The court below was not satisfied with the speed of the actions taken by Sinclair, and we think that the facts justify its displeasure. In order to stimulate the defendant to action at a tempo more in keeping with the vast areas to be explored the court suspended the hearing for many months, indicating by its letter to the litigants that it did not think the rate of development and exploration as followed by Sinclair was adequate. Even after that, Sinclair did not move any faster and the court had no alternative except to enter a judgment compelling it to do so.

That judgment is attacked by Sinclair as being arbitrary and unreasonable. We think quite the opposite is true. We find no reported case approaching this one in the magnitude of operations required and the slow pace of progress in the performance of contractual obligations.

█ Having before it thirty-one separate leases, each entitled to enforcement with respect to the implied covenants to explore, develop and produce,[12] the court chose not to lay that heavy a burden upon defendant, but to treat the entire 90,000 acres as if under one lease. It decreed forfeiture only in event Sinclair declined to carry out the program provided for the first year and granted full protection with respect to developed acreage. It did not, for the ensuing four

---

12. Cf. Meacham v. Halley, 5 Cir., 1939, 103 F.2d 967, 971; Mattison v. Trotti, supra, and 3 Summers Law of Oil and Gas, Par. 515, p. 441.

years, *require* drilling, giving Sinclair the option to surrender, in lieu of drilling each well, 3,000 acres of the leasehold interest it had contended and proven to be worthless. For the five year period covered by the order the rate of drilling was set for one well for each 3,000 acres. The defendant had, for more than twenty-five years, held for a nominal consideration a gamble in which it had everything to gain and nothing to lose. Its leases stood as a cloud upon the title of the landowners and a complete deterrent to development by them or anyone else. Under the facts in this record we do not see how the court could have done other than to grant plaintiffs the relief they sought.

The judgment entered represents, in our opinion, the admixture of common sense with the vast knowledge of oil operations possessed by the trial court, and the program of exploration and development it set for Sinclair was characterized by unusual generosity. Contrary to defendant's contentions, the judgment rendered by the learned trial judge is, in our opinion, clear and unambiguous and the findings upon which it was based are fully justified by the evidence. The judgment is right and is

Affirmed.